EMMA SMITH *vs.* ARIEL SMITH.

Middlesex. March 30, 1898. — June 21, 1898.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, & LATHROP, JJ.

*Statute — Power of Judge to declare Marriage void.*

It is within the power of a judge of the Superior Court to enter a decree for a libellant, under Pub. Sts. c. 145, § 11, declaring the marriage void, where it appears that the libellant, soon after the ceremony and before the consummation of the marriage, on learning that the respondent was afflicted with a venereal disease, refused to live with and never did live with him, and the judge finds that he was constitutionally afflicted with syphilis, with which the libellant would become infected in case of cohabitation, and "that the disease would be transmitted to any offspring which they might have; that, while it was not absolutely incurable, the chances of a cure being effected in the state in which the respondent was were very remote and doubtful."

LIBEL, for a sentence of nullity of marriage. Trial before *Sheldon*, J., who ordered a decree of nullity to be entered, and reported the case for the determination of this court. If, on his findings, he had power to enter such decree, the same was to stand; otherwise, the libel was to be dismissed. The facts appear in the opinion.

*J. C. Burke & W. S. Marshall, (J. F. Corbett* with them,) for the libellant.

No counsel appeared for the libellee.

KNOWLTON, J.   This libel is brought under the Pub. Sts. c. 145, § 11, the first part of which is as follows; " When the validity of a marriage is doubted, either party may file a libel for annulling such marriage, or, when the validity of a marriage is denied or doubted by either party, the other party may file a libel for affirming the same."   The omission of the words, " for fraud or other cause," contained in the Gen. Sts. c. 107, § 4, and in St. 1855, c. 27, does not change the meaning of the provision.   The statute assumes that there may be marriages which are legal in form but invalid in fact.   In terms it confers jurisdiction upon the court, but in reference to the law of marriage it is merely declaratory.

The facts of the present case are peculiar.   On the day of the marriage, soon after the ceremony, the libellant received information that the respondent was afflicted with a venereal disease called syphilis.   She communicated the information to her mother, who immediately charged him with being so afflicted.   He denied the charge, but consented to an examination by a physician.   An examination was made that disclosed the fact, which the presiding justice has found, that he was constitutionally afflicted with syphilis, a contagious disease with which the libellant would become infected in case of cohabitation, " thus seriously impairing her health, and involving consequences of the most grievous character."   The judge also found " that the disease would be transmitted to any offspring which they might have; that, while it was not absolutely incurable, the chances of a cure being effected in the state in which the respondent was were very remote and doubtful." The libellant, on learning the libellee's condition, refused to live with him as his wife, and there has been no consummation of the marriage.   The libellee, knowing his diseased condition, induced the libellant to contract the marriage without informing her in regard to it.   She supposed him to be a man in good health and of good habits, and if she had known that he was suffering from such a disease she would not have contracted the marriage.

The statute to which we have referred has several times been

considered by this court. *Reynolds* v. *Reynolds*, 3 Allen, 605. *Donovan* v. *Donovan*, 9 Allen, 140. *Foss* v. *Foss*, 12 Allen, 26. *Crehore* v. *Crehore* 97 Mass. 330. The fullest discussion of the law applicable to a case like this, of which we have knowledge, is in *Reynolds* v. *Reynolds*, *ubi supra*. In that case a marriage was declared void into which a man was induced to enter by confiding in the representations of the woman whom he took for his wife that she was chaste, when in fact she was with child by another man. It has since been held that, to maintain a petition in such a case, it is not necessary to introduce evidence of express representations, and that a petition cannot be granted if it appears that the petitioner had himself been guilty of criminal intercourse with the woman before the marriage. The precise point decided in *Reynolds* v. *Reynolds* has been adjudicated in other States, and in this country seems to be generally accepted law. *Baker* v. *Baker*, 13 Cal. 87. *Carris* v. *Carris*, 9 C. E. Green, 516. See also *Morris* v. *Morris*, Wright (Ohio), 630 ; *Ritter* v. *Ritter*, 5 Black. 81; *Scott* v. *Shufeldt*, 5 Paige, 43. The law in England is held otherwise. *Moss* v. *Moss*, [1897] P. D. 263.

The opinion of the learned Chief Justice to which we have referred treats of the law in reference to ordinary contracts procured by fraud, and points out the distinction between contracts to marry, or executory contracts of marriage, and executed contracts of marriage. There is no reason why executory contracts of marriage should not be treated, in reference to the fraud of either party, like any other contracts. We think it is well settled that fraud of such a kind in its essential elements as would invalidate an ordinary contract, is a good defence to an action upon a contract to marry. *Van Houten* v. *Morse*, 162 Mass. 414. But after a contract to marry has ripened into a marriage, different considerations affect the case. On grounds of public policy, the law seeks to make the marriage relation in every case as nearly permanent as possible without doing injustice. The difference between the relations of a man and woman affianced, and their relations after marriage, is more than the difference between those who have made an ordinary executory contract and the same persons after the contract is executed. At marriage there

is a change of status, which affects them and their posterity and the whole community. It is a change which, for important reasons, the law recognizes, and it inaugurates conditions and relations which the law takes under its protection. It is of such a nature that it cannot lightly be disregarded. The contracting parties take each other for better or for worse, and agree to abide the consequences of misinformation or mistake in regard to each other. Says Chief Justice Bigelow, in *Reynolds* v. *Reynolds*: "In the absence of force or duress, and where there is no mistake as to the identity of the person, any error or misapprehension as to personal traits or attributes, or concerning the position or circumstances in life of a party, is deemed wholly immaterial, and furnishes no good cause for divorce. Therefore no misconception as to the character, fortune, health, or temper, however brought about, will support an allegation of fraud on which a dissolution of the marriage contract, when once executed, can be obtained in a court of justice. These are accidental qualities, which do not constitute the essential and material elements on which the marriage relation rests." The decree of nullity was entered in that case, not merely because the libellant was deceived in regard to the supposed chastity of the libellee, — for it is generally accepted law that unchastity of either party before marriage will not warrant a decree of divorce or nullity, — but because, besides the unchastity, the woman was in such a condition that she could not properly assume the duties of wifehood. More than that, she was in a condition to introduce into the husband's family spurious offspring, of which he would be presumed in law, if not in fact, to be the father. The deception, viewed in its different aspects, was in regard to facts essential to the very existence of the marriage relation. Her condition in reference to the objects of marriage was somewhat analogous to impotence, which, without reference to fraud, is always held to be a ground for a decree of nullity.

So far as we are aware, this is the only particular in which mistake or fraud in regard to the condition, character, or experience of one of the parties to a marriage has been held to be a ground for a decree of nullity or of divorce in favor of the other in this Commonwealth. Most courts in other juris-

dictions have gone no further in favor of libellants. But in *Cummington* v. *Belchertown*, 149 Mass. 223, it appeared that a marriage was set aside for fraud by a court in New York, on the ground that the libellee had been afflicted with insanity before the marriage and had concealed the fact, and not long afterwards had again become insane. It was held by this court that the marriage could not have been declared invalid for this cause in this Commonwealth.

The case at bar rests solely upon fraud in regard to the bodily condition of the libellee. As we have already seen, the previous unchastity of the libellee is not enough to entitle the libellant to relief. Indeed, we are not quite certain from the report that the libellee might not have been constitutionally affected with the disease from his birth. But on the findings of the judge, his concealed disease was such as would leave with him no foundation on which the marriage relation could properly rest. It had advanced to such a stage as probably to be incurable. The libellant could not live with him as his wife without making herself a victim for life, and giving to her offspring, if she had any, an inheritance of disease and suffering. While this case lacks the element of introducing a bastard child into the husband's family, which existed in *Reynolds* v. *Reynolds*, it has the element of a loathsome incurable contagious disease to be communicated to the wife, which the other had not. Few if any would be bold enough to say that it was the duty of the libellant, on discovery of the fraud before consummation of the marriage, to give herself up as a sacrifice, and to become a party to the transmission of such a disease to her posterity.

It may be said that this cause for a decree of nullity is not different in kind, but only in degree, from other bodily or mental conditions which the law does not recognize as a good ground for a separation. There are many peculiarities of body or mind, natural, or acquired, or contracted, which may render one, in a broad sense, unfit for matrimony, and of which, if concealed until after marriage, the law can take no cognizance in a suit for a separation. In proceedings in court it is more difficult to deal with conditions like these in the case before us than with that in *Reynolds* v. *Reynolds*, because they are

obscure, and it is hard to ascertain the truth. For this reason there is more danger in opening the door to libellants in such cases. Yet there may be circumstances in which justice requires that relief should be given.

In *Reynolds* v. *Reynolds*, much stress was laid upon the difference between an executory and an executed contract of marriage. But for fraud in procuring ordinary contracts, the law gives a remedy as well after the contract is executed as before. The learned Chief Justice did not say exactly at what stage a contract of marriage should be deemed to be executed. Clearly it is executory up to the time of the ceremony. Viewed in its legal aspect, it becomes a binding marriage as soon as the ceremony is performed; but the full execution of the contract contemplated by the parties in their original agreement is then just beginning, and is to continue during their joint lives. Their status up to the time of the ceremony is that of parties to an executory contract. Their status as soon as the ceremony is performed is that of persons legally married, who, with the sanction and under the forms of the law, have assumed new relations to each other and to the state. But these new relations are then rather inchoate than complete, and they do not assume their perfected form so as to have their full possible effect upon the parties and the community until consummation of the marriage. There are, therefore, reasons why a fraud like that in the present case, discovered before consummation of the marriage and at once made a ground for separation, should move the court more strongly in favor of the libellant than if the discovery had come later. 1 Bish. Mar. Div. & Sep. §§ 456, 461, 462. The reluctance of the court to recognize such frauds as a ground for legal proceedings is founded on considerations of public policy. These considerations are much less weighty in a case like the present than if the parties had cohabited for a considerable time before the proceedings were commenced. Although in many cases the distinction between consummated and unconsummated marriages in proceedings for separation has been overlooked, it is distinctly recognized in *Lyndon* v. *Lyndon*, 69 Ill. 43, and *Robertson* v. *Cole*, 12 Tex. 356, in each of which cases a decree of nullity was entered when the court said that the ground

would have been insufficient if the marriage had been consummated.

We do not intimate that the concealed existence of venereal disease in one of the parties to a marriage will ordinarily be a sufficient ground for a decree of nullity. In most cases, presumably, the disease is curable. But, confining our decision to the facts before us, we are of opinion that it was in the power of the judge of the Superior Court to enter a decree for the libellant. *Decree for the libellant.*