(No. 16133.—Decree reversed and order affirmed.)
LYDIA HOFFMAN, Defendant in Error, *vs.* GEORGE R. S. HOFFMAN, Plaintiff in Error.

*Opinion filed February 17, 1925—Rehearing denied April 11, 1925.*

1. SEPARATE MAINTENANCE—*what must be alleged and proved before wife is entitled to separate maintenance.* To entitle a wife to a decree for separate maintenance she must allege and prove, first, that she has a good cause for living separate and apart from her husband, and second, that such living apart was without fault on her part.

2. SAME—*when former decree is res judicata.* Where a wife files a bill for separate maintenance, charging cruelty and misconduct toward her making it necessary to live apart from her husband, a finding against her on such charges is equivalent to a finding that her separation was originally without cause and is *res judicata* of that question on the hearing of a second or amended bill alleging that she offered in good faith to return after said finding against her and that her husband then refused to live with her.

3. SAME—*when a wife is not entitled to separate maintenance.* Where a wife voluntarily abandons her husband or does so without good cause she is not entitled to separate maintenance, for the

reason that she is not living separate and apart from her husband for good cause and without fault on her part.

4. SAME—*when a husband is not liable for refusal to resume marital relations.* While it is the duty of a husband to receive back his wife upon her offer to return even though the original separation was without the husband's fault, the preponderance of the evidence must show that the offer was made in good faith.

5. SAME—*when decree of chancellor will not be sustained.* The Supreme Court will reverse the finding of the chancellor where it is of the opinion that such finding is manifestly contrary to the weight of the evidence.

6. SAME—*when order for alimony and solicitor's fees on appeal is proper.* Under section 15 of the Divorce act, where an appeal is taken by the husband from a decree for separate maintenance, the court is authorized to enter an order for reasonable alimony and solicitors' fees *pendente lite* for the wife's support and defense on the appeal, and such order will be sustained even though the decree is reversed.

WRIT OF ERROR to the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Winnebago county; the Hon. ROBERT K. WELSH, Judge, presiding.

ROY F. HALL, E. D. REYNOLDS, and MORRIS J. HINCHCLIFF, for plaintiff in error.

FISHER, NORTH, LINSCOTT & GIBBONEY, for defendant in error.

Mr. JUSTICE STONE delivered the opinion of the court:

This cause comes on *certiorari* from the Appellate Court for the Second District to review the affirmance of a decree of the circuit court of Winnebago county granting separate maintenance to defendant in error. The bill was filed on November 14, 1922. The decree entered April 6, 1923, required plaintiff in error to pay the sum of $75 per month, beginning April 15, 1923, and the sum of $200 solicitors' fees. An additional order was on June 30, 1923, entered, requiring that plaintiff in error pay the sum of

$75 per month as alimony *pendente lite,* and $250 as solicitors' fees by reason of the appeal of plaintiff in error. The only questions involved in the case are whether the evidence justified the decree for separate maintenance and the propriety of the allowance of solicitors' fees.

It appears from the bill and the evidence in the case that plaintiff in error is a man 74 years of age and defendant in error is 53; that they were married in November, 1921, and that defendant in error left plaintiff in error in February, 1922, and filed a bill for separate maintenance against him, alleging that he is a man of ungovernable temper, that he had assaulted and beaten her and had used vile language toward her, and that he had so conducted himself toward her as to render further living with him impossible. A hearing was had on the bill on June 27, 1922. After considering the evidence the chancellor found the charges were not sustained and dismissed the bill for want of equity.

The amended bill alleges that in the month of June, 1922, complainant went to the home of defendant in good faith and with full intention on her part to do her duty toward him as his wife and refrain from any conduct on her part of which he could justly complain and advised him that she was ready and desirous of resuming her position in his home as his wife and in all respects to fully conduct herself as such wife; that she remained there a brief time, during which time defendant refused to recognize or speak to her or make suitable or proper provision for her support and maintenance; that thereafter defendant leased the home to tenants. The bill also sets out that she in the month of September went to defendant in good faith with the desire to live in and occupy his home as his wife and so told him; that he refused to permit her to do so.

Plaintiff in error's answer denied that any visit made by complainant was made in good faith and with an intent on her part to do her duty toward him and atone for

past mistakes or that she was desirous of resuming her
position in his home; denied that she conducted herself
during that time in a dutiful and proper manner; avers
that on the day the bill for separate maintenance was dis-
missed by the court complainant went to his home without
previous notice of her intention and broke in the door and
without his sanction or request went to a room in the house
where she remained over night and that she left the fol-
lowing day; that she had never at any other time come
to his home or offered to bring back the things she had
taken away and gave no indication that she desired to be
forgiven for her former conduct. The answer denies that
the visit was in good faith but avers that it was made in
bad faith, solely for the purpose of laying a foundation
and basis for instituting further proceedings against him,
and that there was no effort on her part for reconcilia-
tion but simply a scheme to deceive and to institute further
court proceedings; that defendant was greatly humiliated
and chagrined and suffered mentally and physically by
complainant's former suit and her attitude toward him in
bringing the same and swearing falsely against him, and
also in carrying away certain articles and keepsakes be-
longing to him of his personal property and household
goods; denied that she in September came to him in good
faith with a desire to live with him but that she did so
simply for the purpose of laying ground for another lawsuit.

On the hearing defendant in error testified that on the
evening of June 27, 1922, about one and one-half hours
after the dismissal of her suit for separate maintenance,
she went to the home of plaintiff in error and entered the
house by a key which she had retained when she left in
February, 1922; that plaintiff in error was not at home
when she arrived but came in about eleven o'clock in the
evening; that she had retired in a room different from
that which they had used when living together; that when
he came into the house he looked into the room and she

said, "Hello, George! I have come back;" that he said nothing; that she then said, "I have come back to live with you, George; I have come back and I want to get along if we can;" that he made no answer; that he went to his room and closed the door; that the next morning when he was getting ready to leave she went down-stairs and said, "George, can I order some groceries?" that he just looked at her and said nothing; that she said, "Can't we talk this over? I want to do the right thing and live with you as your wife," but that he kept on going and left the house; that she left the house that day; that she saw the plaintiff in error again at his place of business in the month of September, 1922. She at first stated that she was advised by her attorney that plaintiff in error wanted to see her, afterwards, however, she testified that plaintiff in error did not know of her visit on that day until she arrived; that Carl J. Mohr went with her from the office of her counsel, and that when she arrived she said, "George, I have come to speak to you, and I would like to go back to you and live with you as your wife and try to get along;" that he said, "No! No! No!" that she repeated the statement and he made the same reply; that he also said, "Well, I won't speak to you now; I am busy; you come to-night at 7:30, and come alone;" that he asked if Mohr was a relative of hers, and Mohr said he was not; that she went back at 7:30 and had further conversation with him and again asked him to take her back, stating that the fact that she had offered to come back ought to prove that she was sorry for what happened; that he said he didn't think there was any chance for reconciliation; that he had leased the home for two years; that he intended to get a divorce but wouldn't give his final answer that night; that he would call her up later; that on the following Tuesday he called her up and told her to come down for his final answer; that he said he had two propositions to make: one was, that she should go to work and he would help her to find

work, and that she must go to church, and after a year
from April, if she had done what he asked her to do, he
would talk with her about coming back; that his other
proposition was, that if she would consent to a divorce he
would give her $100; that she said, "Good night, Mr. Hoff-
man," and left. On cross-examination she stated that she
went with Mohr on advice of her counsel when she visited
plaintiff in error on September 21. She testified that she
did not call him on the telephone after June 27 and had
never stated to anyone that she was sorry for the trouble
she had brought to his home; that she had called on her
lawyer the day of her visit to plaintiff in error on Sep-
tember 21 because her lawyer was to see plaintiff in error's
lawyer to see what he would do for her.

Defendant in error called Carl J. Mohr, an attorney of
Rockford, who testified that he went with her to the print-
ing office of plaintiff in error some time in the fall of
1922; that he thought it was November, because both he
and Mrs. Hoffman had their winter coats on; that they
were in plaintiff in error's office about six minutes; that
she said, "George, I want to speak to you a moment; I
want to come back;" that she repeated the words, "George,
I want to come back," and he said, "No! No! No!" that
that was all that was said; that he left the office with de-
fendant in error. He testified also that he was one of the
firm of attorneys who were counsel for defendant in er-
ror; that he thought the visit to plaintiff in error was prior
to November 14, the day of the filing of this suit, though
he did not know.

Flora Martell was called by defendant in error and
testified to a telephone conversation with plaintiff in error
on November 14, about two o'clock in the afternoon; that
he called for Mrs. Hoffman, who was away for the day;
that she was staying at the house of the witness; that he,
on finding that she was not there, gave a message to the

316—14

witness, telling her it would be impossible to have an interview that night, as was planned; that it would be useless to have any more interviews. She testified that she gave that information to Mrs. Hoffman upon her return home that evening. No one else testified to this telephone communication and plaintiff in error denies it positively.

Defendant in error also placed on the witness stand E. D. Reynolds, who was at that time counsel for plaintiff in error but who has since been elected one of the circuit judges of that circuit. He testified that he had some conferences with Mr. North, counsel for Mrs. Hoffman, about her difficulties; that the talk was always on the question of financial settlement; that North did not tell him that Mrs. Hoffman would go back; that he told North that Mrs. Hoffman ought to go back to Hoffman; that she ought never to have left him; that it was a great mistake on her part to do what she did; that her counsel never at any time asked if there was any way by which she could be taken back or suggested the matter of her going back. The conversation was always upon the matter of financial settlement.

Plaintiff in error testified that on the evening of June 27, 1922, he went to his home about twelve o'clock; that he went to the back door, which he had been accustomed to using as the house was not occupied, and found a pane of glass broken out of the back door and a brick lying near the base of the door; that he had left the house locked that morning, both front and back doors; that the front door was locked by a night latch in such a way that it could not be opened by a key from the outside; that when he got home defendant in error was in a room up-stairs; that she did not speak to him and he did not speak to her; that he went to his room and slept there, rising about six o'clock in the morning; that he arose and dressed and had his coat on, ready to go down-town, when defendant in error came down-stairs in a wrap and slippers and said

something as he was going out which he did not hear; that he remained in his office all that day and heard nothing from her; that when he went back to the house that evening there was no one in the house; that he had no knowledge that she was coming back after the dismissal of the case against him; that he had received no communication from her of any kind since she had left him the February before; that when she went away she took everything that belonged to her and returned none of it; that on the night she came to the house she had a small grip but brought no other property; that he did not see or hear from her again until the following fall, when she and Mohr came to his office; that she said, "Can I talk with you a few minutes?" and he said, "Yes;" that she said, "Judge Welsh says I wasn't right, and I want to come back;" that he said: "That is a question that I cannot answer on the impulse of the moment; I will have to have time to think it over; I am too busy here to talk to you; come back this evening at 7:30, alone; I will not talk to you in the presence of anyone;" that he did not then know Mohr; that he did not say, "No! No! No!" to the statement of Mrs. Hoffman that she wanted to come back. He further testified that she came back alone that evening; that he stated to her that he did not understand her, after the way she had treated him, the insults and abuse that she had heaped upon him and the falsehoods that she had sworn to on the witness stand on the previous hearing; that he did not see how she could expect him to trust her and take her back, but that if she would go to Dr. Gordon and ask him to forgive her for what she had said about him and the people of his church and ask him to introduce her to the ladies of the church, and if they received her properly, he would have a talk with her again in case her disposition toward him had changed; that she at that time said nothing to him to indicate that she wanted him to forgive her, or that she was wrong or wanted him to overlook what

had happened. He stated that in this interview he had not given any thought to the matter of money settlement; that in reply to her inquiry as to what he would do for her in the meantime, he said he could not contribute to her support without condoning her desertion, which he would not do; that on the following Tuesday night she came down to see him again at his request; that he told her he would give her $100 and would get a divorce; that she said "Good night," and went out in an angry mood. This was the substance of the evidence in the case.

In order to support the decree for separate maintenance it is necessary that the complainant allege and prove first that she has a good cause for living separate and apart from her husband, and second that such living apart was without fault on her part. (*Decker* v. *Decker,* 279 Ill. 300; *Johnson* v. *Johnson,* 125 id. 510.) A hearing was had on the bill filed in February, 1922, on the charge of cruelty and misconduct toward her and a finding against her on that charge was made. That decree was binding upon her and was *res judicata* of all her charges of cruelty and misconduct toward her and upon the question whether up to that time she had been living separate and apart from plaintiff in error by reason of his fault. In effect it was a finding that she had left him without good cause.

Where a wife voluntarily abandons her husband or does so without good cause she is not entitled to separate maintenance, for the reason that she is not living separate and apart from her husband with good cause and without fault on her part. (*Deke* v. *Huenkemeier,* 289 Ill. 148; *Hutchinson* v. *Hutchinson,* 250 id. 170; *People* v. *Rickert,* 159 id. 496; *Wahle* v. *Wahle,* 71 id. 510; *Jones* v. *Smith,* 13 id. 301.) The rule also is, that even though an original separation may be without fault of the husband, if afterwards the wife in good faith offers to return and live with him and shows by her conduct that she is sorry for what has transpired, it is his duty to receive her back and

provide for her. (*Thomas* v. *Thomas,* 152 Ill. 577; *Johnson* v. *Johnson, supra.*)  But unless the preponderance of the evidence shows that such offer to return is made in good faith, the husband cannot be held liable for separate maintenance on his refusal to resume marital relations with her.  In this case defendant in error testifies that she in good faith sought to return.  The only corroboration she has as to any conversation whatever between her and her husband on that matter, other than what he testified to, is as to that occurring in the presence of Mohr, who went with her as her attorney to interview the plaintiff in error. The evidence shows that after having lived with him three months she left him and filed a suit against him charging cruelty and abuse and that he was a man of ungovernable temper.  It appears that he had lived in Rockford for many years, and such a charge against him would naturally result in very great embarrassment, humiliation and suffering to him.  The chancellor found that her charges in the first case were not sustained and dismissed the bill.  She states that she had never told anyone that she was sorry for what happened, and the plaintiff in error testifies that she had never at any time said anything to him that indicated regret on her part for having humiliated him in that way.  The testimony of Judge Reynolds, who was called as her witness, was that conversations which he had with her counsel were all looking toward a question of money settlement; that nothing was said about a desire on her part to return to live with plaintiff in error.

While it was the duty of plaintiff in error to receive defendant in error back as his wife if her offers to return and make amends for past occurrences were made in good faith, yet he had a right to have some assurance that such offers to return were so made.  After filing a bill against him charging him with cruelty, and in accordance with which it is but fair to infer she had testified, it would be abhorrent to say that merely because she came to the house

an hour and a half after her bill had been dismissed and stated that she had come back to live with him, to see if they could get along together, he must take her back without any assurance whatever that she had made that offer in good faith. In fact, returning as she did so soon after a hearing on her bill, in which she had charged that she could not live with him because of his cruelty toward her, her calls at his office with her counsel in September, and the fact that she had never said that she was sorry for having caused him the humiliation brought about by her unsuccessful bill and testimony on the former hearing, all tend to rebut her statement on the witness stand that she in good faith desired to return to him. This court will not reverse the finding of the chancellor in a case where the witnesses are heard by him unless it feels that such finding is manifestly contrary to the weight of the evidence, yet where we are of that opinion it is our duty to reverse such finding. We are convinced in this case, on a review of the record, the situation of the parties and what had transpired between them, that defendant in error has not sustained the burden resting upon her to prove an offer to return in good faith and that she is not entitled to a decree for separate maintenance.

It is also objected that the court erred in ordering the sum of $75 per month as alimony, and also in fixing the solicitors' fees. It appears that on appeal of this cause to the Appellate Court the circuit court entered an order allowing the sum of $250 as solicitors' fees and the sum of $75 per month, to commence on the 6th day of April, 1923, as alimony *pendente lite.* Under section 15 of the Divorce act (Smith's Stat. p. 747,) the court was empowered to enter an order for alimony and solicitors' fees *pendente lite* for her support and defense on appeal where the appeal is taken by the husband. We are of the opinion that the order for solicitors' fees and alimony *pendente lite* were reasonable and should be sustained.

For the reasons herein given, the decree for separate maintenance is reversed and the order for alimony and solicitors' fees *pendente lite* will be affirmed.

*Decree reversed; order for alimony affirmed.*