(No. 18994.—

Amelia Bielby, Appellant, *vs.* Joseph E. Bielby, Appellee.

*Opinion filed February 20, 1929.*

Smith, Marx & Smith, (Charles W. Lamborn, of counsel,) for appellant.

Newby & Murphy, (John K. Murphy, and George M. Burditt, of counsel,) for appellee.

Mr. Justice Stone delivered the opinion of the court:

Appellant, Amelia Bielby, filed a bill in the circuit court of Cook county for separate maintenance. Appellee, Joseph E. Bielby, answered the bill and filed a cross-bill seeking annulment of his marriage with appellant on the ground of fraud, and to set aside a conveyance in joint tenancy to appellant and appellee of forty acres of land owned by appellee at the time of the marriage. On a hearing before the chancellor a decree was entered dismissing appellant's bill for separate maintenance and decreeing that the marriage between appellant and appellee be annulled and that the deeds of conveyance be set aside. Amelia Bielby has appealed.

The parties were married on July 8, 1925, and the land involved was by *mesne* conveyances vested in them in joint

tenancy.   The bill for separate maintenance charges that the parties cohabited together as husband and wife until July 10, 1925, when appellee left and abandoned appellant and refused longer to live with her or provide for her.   Appellee's answer to the original bill admitted that they were married, but averred that they at no time lived and cohabited together after the marriage but that appellant had at all times refused to live and cohabit with him at any place as his wife; that she consented to marry him for the sole purpose of cheating and defrauding him out of his property, in the furtherance of which scheme she simulated affection for him, but informed him that unless he would consent to deed the property to them jointly she would refuse to enter into the marriage ceremony, and that he consented. The answer denies abandonment and a refusal to support appellant or provide a home for her, but avers that he at all times offered to live with her and provide a home but that she refused to go with him to his home or to live or cohabit with him at any place.   Appellee filed a cross-bill praying that the marriage with appellant be annulled and that she be required to convey the forty acres of land to him and that the deeds made be set aside.   He charges that the deeds were procured by fraud and that she procured and induced the marriage for the sole purpose of inducing him to convey his land to her in joint tenancy; that though he frequently went to her home and requested and demanded that she live with him, she refused to do so.

Appellant contends that the decree is against the manifest weight of the evidence.   The parties to the case had lived in the same neighborhood for a number of years.   Appellee lived with his brother near the forty acres involved in this case.   Appellant lived between three and five miles distant, with her mother, farming forty acres of land belonging to her mother and doing the farm work as well as assisting with the household duties.   She was approximately forty years of age while he was sixty.   In the spring of

1925 he began calling upon her and according to his testimony first broached the question of their marriage during the month of June. She consented, provided he would deed his forty acres of land so that it would be owned by them both as joint tenants, to which he agreed. They together visited a lawyer prior to their marriage, who advised that they think it over and that the deed be not made until after the marriage ceremony. It was agreed between the two that after the marriage he would go to her home and there live with her and her mother, who had given her consent to this arrangement. On July 8 the parties went to Willow Springs and there took a street car into the city of Chicago, where they obtained a license and were married by a minister in a church on Washington boulevard. When the ceremony was completed they went to the office of appellant's attorney, named Welk. Appellant told the atney that they desired to have the deeds executed, whereupon a deed was drawn transferring the property to Catherine Rammer, a stenographer in Welk's office, who in turn conveyed the property to appellant and appellee in joint tenancy. The parties thereupon left Welk's office and after having dinner took the street car to Willow Springs. They both testify that it was agreed that the marriage would be kept secret though they do not agree as to who desired that arrangement, each testifying that the other proposed that the matter be kept secret. They agree in their testimony that their wedding rings were taken off before they started driving home, and that when they arrived at the road leading to the residence of his brother, appellee got out of the buggy and they bade each other good night. He testified that he thought it was best for him to go to his brother's that evening and that she said she thought it was all right. It appears from the testimony of both that he went over to her home the next morning and assisted with the work on the farm during the day. He had his meals there and in the evening returned to his brother's home. He was

asked whether she requested that he remain with her, and he replied that "she kinda mentioned that, yes," further testifying that she told him that they had a davenport in the parlor and he could sleep on that. Both parties also testify that each day for a period of approximately six weeks after the 9th of July he came to her home, assisting more or less with the work, and each evening returned to his brother's home. Part of the time he walked the distance and part of the time appellant took him part way with the horse and buggy. It appears from his testimony that at different times she invited him to stay over night; that she said they could pull out the davenport in the parlor and he could sleep on that. He also admitted on cross-examination that she had asked him to bring his clothes and stay there. He did not at any time, however, remain over night at her home and she never at any time stayed at his home. After a period of about six weeks he discontinued his visits to her home. She testifies, and it is not denied by him, that she went to him to find why he had not come, and he replied that he had a lawyer and she could talk to him. There is also the testimony of her brother that about that time appellee had told him that he had been told that appellant had gone away with a good-looking young man. This testimony is disputed by appellee. It is admitted, however, that he did not call at the home of appellant or see her from the early autumn of 1925 until April, 1926. The evidence, however, is, that on advice of his counsel he built a portable house on the forty acres in November, 1925, although he does not say that between that time and April, 1926, he told appellant that he had built such a home. She testifies that she knew nothing of it.

The first question arising on this record is whether the court erred in decreeing annulment of the marriage. The cross-bill is based on the charge that appellant simulated affection for appellee for the purpose of securing an interest in his property and married him in furtherance of that

purpose and in fraud of him, and that she did not thereafter carry out her obligations as a wife. Appellee testified that he wanted a home and that his purpose in making the proposition of marriage to appellant was that he might have a home; that she would take care of the home for him, and that was the consideration for the deed and marriage. The cross-bill charges that the marriage should be annulled and the conveyance set aside because of appellant's fraud in the procurement of the deeds. It is also charged in the cross-bill that appellant refused to enter into the relationship of marriage or to consummate the marriage; that appellee frequently requested and demanded that she live with him but she refused to do so. The only times at which appellee testifies that he requested appellant to live with him were in the latter part of August, 1925, and in April, 1926, at the home of Claus Sheels. She denies any request was made in August. The testimony shows that the parties met at Sheels' home in April at the instance of Sheels and one Keeney, who were friends of the parties, and appellee told appellant that he had prepared a home for her on the forty acres owned by them in joint tenancy and asked her to come and live with him, but that she refused to do so. Appellant testifies that she was not asked to go to appellee's house but that she told him she would take him back if he would behave himself. The evidence of Sheels and Keeney is, however, that she refused to go to the home which appellee had prepared on the forty-acre tract. Appellee testified that the marriage relation was not consummated; that they never cohabited as man and wife. She denies this statement and says that the marriage relation was consummated. Appellee does not testify that he ever requested that the marriage be consummated or that she ever refused so to do.

It is argued that appellant falsely promised to live with appellee and make a home for him without any intention of so doing. Fraud sufficient to vitiate a marriage must

go to the essence of the marriage relation. The degree of fraud sufficient to vitiate an ordinary contract will not afford sufficient ground for the annulment of a marriage. It is not sufficient that the complainant relied upon false representations and was deceived. False representations as to fortune, character and social standing are not essential elements of the marriage, and it is contrary to public policy to annul a marriage for fraud or misrepresentations as to personal qualities. The fraudulent representations for which a marriage may be annulled must be of something essential to the marriage relation—of something making impossible the performance of the duties and obligations of that relation or rendering its assumption and continuance dangerous to health or life. (*Lyon* v. *Lyon,* 230 Ill. 366; *Smith* v. *Smith,* 171 Mass. 404; *Ryder* v. *Ryder,* 66 Vt. 158; Schouler on Domestic Relations, par. 23.) It is said in 2 Kent's Commentaries, 77: "It is well understood that error, and even disingenuous representations, in respect to the qualities of one of the contracting parties as to his condition, rank, fortune, manners and character would be insufficient. The law makes no provision for the relief of a blind credulity, however it may have been produced." The misrepresentation, in order to constitute fraud for which an annulment of a marriage may be decreed, must be as to some existing fact, as, a legal or physical impediment to the marriage, and not a promise as to future conduct. Even in ordinary civil cases, representations, to be fraudulent, must relate to a present or past state of facts and not to promises looking to the future.

In *Wells* v. *Talham,* 180 Wis. 654, a bill was filed to annul a marriage on the ground that the husband was infirm in physical health; that he was a Roman Catholic; that the canons of the church permitted marriage to no one who had been divorced, under penalty of excommunication; that the wife knew of this canon and knew that the husband would not have consented to marry her if he

had known she was divorced, but that, notwithstanding this, she represented to him that she was a widow and promised that the marriage would be solemnized in the Catholic church after the ceremony in the Methodist church, knowing at the time that she could not carry out this promise and intending at that time not to carry it out. It was there held that the charges of fraud were inadequate, though the decree found that appellant never intended to carry out her promise to live with the defendant and make him a dutiful wife.

A promise made with an affirmative intent not to perform cannot be made the basis of an action for fraud. (*Keithley* v. *Mutual Life Ins. Co.* 271 Ill. 584; *Grubb* v. *Milan,* 249 id. 456.) While the statement of a matter in the future, if affirmed as a fact, may amount to a fraudulent misrepresentation, it must amount to an assertion of a fact and not an agreement to do something in the future. *Miller* v. *Sutliff,* 241 Ill. 521; *Day* v. *Fort Scott Investment Co.* 153 id. 293; *Gage* v. *Lewis,* 68 id. 604; Pomeroy's Eq. Jur. sec. 877.

Appellee cites *Anders* v. *Anders,* 224 Mass. 438, as supporting his right to annulment. In that case it appeared that the parties had been engaged a week before the ceremony; that during this week the wife had been making arrangements to go to Germany, where her mother lived; that she had an illegitimate child, and was told by a friend several days before the marriage that it would be necessary that she have marriage papers in order to satisfy the authorities and to secure a passport. She told this friend that she was going to get a ticket the next day. This was about four days before the marriage. After the ceremony she walked about a block with her husband and then said that she wanted to see a dentist and on that excuse left him, promising to be home in a couple of hours. She did not return and he never saw her again. She wrote him from Germany, saying that she didn't know what she was doing;

that she must have been crazy at the time and that she never would see him again. It was there held that the wife went through with the ceremony solely to secure the right to bear the name of a married woman and in that way hide the shame of having an illegitimate child. This case appears to stand alone even in Massachusetts, and is not in accordance with *Chipman* v. *Johnston,* 237 Mass. 502, and *Richardson* v. *Richardson,* 246 id. 353. There was in the instant case no basis in the evidence upon which a decree of annulment could be founded, and the circuit court erred in entering such a decree.

The question then arises, Was appellant entitled to a decree for separate maintenance? While the evidence in the record is that after the first six weeks following their marriage appellee did not visit appellant, and that she at one time endeavored to find out from him the cause of the difficulty and was told by him that she should consult his attorney, the evidence also discloses that after he had built a house on the forty acres he requested her to move into the house with him and that she refused to do so. To maintain a bill for separate maintenance by a wife against her husband she must not only show that she has good cause for living separate and apart from him but also that such separation was without fault on her part, and if she voluntarily consents to a separation, or is guilty of failure of duty or of misconduct materially contributing to the destruction of the marital relation, she is not without fault within the meaning of the statute. (*Hoffman* v. *Hoffman,* 316 Ill. 204; *Decker* v. *Decker,* 279 id. 300; *Johnson* v. *Johnson,* 125 id. 510.) During the month and a half after the marriage ceremony in which appellant claims that appellee was at her home every day, she part of that time drove him part way home. This is evidence of a consent at that time to their living as they were. She refused to return to him after he had built a house and requested her to live with him, and she is not entitled to a decree for separate main-

tenance, and the chancellor did not err in dismissing her bill praying that relief.

This leaves for consideration the assignment of error on the decree requiring a re-conveyance of the property. Marriage from the earliest period of the common law has been held to be a sufficient consideration to support a conveyance of land. (*Jackson* v. *Jackson,* 222 Ill. 46; *Otis* v. *Spencer,* 102 id. 622.) In the *Jackson case* a deed was made by Jackson on the promise that appellee would marry him, and it was argued that since she, at the time of receiving the deed, promised to be a kind and dutiful wife and to use the property for the joint benefit of herself and husband and to support the latter in his old age, her failure to keep such promise caused a failure of consideration for the deed, and that a presumption therefore existed that she obtained the title to the premises with the fraudulent intent to deprive her husband of his title thereto, and that he was for that reason entitled to a decree rescinding the deed and restoring the title to himself. It was, however, in that case held that if the contention of the husband was borne out by the record it would show only a partial failure of consideration, and a court of equity will not ordinarily decree a rescission of a contract where there is only a partial failure of consideration. Especially is this true where the party against whom the rescission is sought cannot be placed *in statu quo.* To the same effect are *Doane* v. *Lockwood,* 115 Ill. 490; *Ballance* v. *Vanuxem,* 191 id. 319; *Leopold* v. *Salkey,* 89 id. 412; *Selby* v. *Hutchinson,* 4 Gilm. 319.

Counsel for appellee cite in support of the decree the case of *Hursen* v. *Hursen,* 212 Ill. 377. In that case the deed was not made in consideration of marriage but of agreements made after the marriage, upon the wife's promise of faithfulness in the future. Hursen, a widower, proposed marriage to a widow, who told him she would marry him if he would buy her a seal-skin coat, a diamond ring and deed her a portion of his property. He purchased the

coat and ring, gave her $50 in cash, and just before their marriage offered her a deed for a half interest, worth $2500, in a farm in Indiana. She at first declined the deed and refused to marry him unless he would convey other property worth $8000. However, she finally agreed to the marriage and took the farm deed. Within an hour after the ceremony she left for Chicago, telling her husband that when he decided to give her the $8000 property she would return the farm deed and be to him a wife. Some two days later he went to her and said if she would return to the farm and live with him and be a faithful wife he would convey as requested, and upon her promise to do so he made the conveyance which was the subject matter of the suit in that case. The parties went to the Indiana farm, where she occupied his bed for three nights and then left and refused to live with him. It was there held that there was no consideration for the transfer; that evidently the wife obtained the second deed through false promises and representations, with the design of obtaining the property and then abandoning her husband. A marked distinction is to be noted between that case and a case where marriage is made a part consideration for the transfer, the failure and refusal to live up to promises relating to the married life of the parties constituting but a partial failure of consideration. *Hursen* v. *Hursen, supra,* is not analogous to the situation here.

*Wiederhold* v. *Wiederhold,* 305 Ill. 429, also cited by appellee, was likewise a case where the wife procured property from her husband in consideration of her promises to thereafter conduct herself as a faithful wife, and it appearing that such promises were made for the purpose of procuring the property of the husband with no intention of performing such promises, the transfers were set aside. Of like character were the cases of *Coonce* v. *Coonce,* 296 Ill. 585, and *Fischer* v. *Fischer,* 245 id. 426. As was said by this court in *Jackson* v. *Jackson, supra,* cases of that

character rest upon equitable considerations, which do not obtain in this case.

It was error to decree a re-conveyance of the property. The decree of the circuit court is reversed and the cause remanded, with directions to dismiss the bill and cross-bill, costs to be taxed one-third to appellant and two-thirds to appellee.

*Reversed and remanded, with directions.*