VALERIE V. LINDQUIST, petitioner-appellant,

*v.*

JOHN L. LINDQUIST, defendant-respondent.

[Argued February 13th, 1941. Decided May 20th, 1941.]

12

Mr. *Charles Handler* (Mr. *Leo Yanoff*, on the brief), for the appellant.

Mr. *Edward R. McGlynn*, for the respondent.

The opinion of the court was delivered by

HEHER, J.

The appeal is from a decree of nullity of marriage on the ground of fraud, in that, as found by the master, petitioner was guilty, in the face of defendant's request for a full disclosure, of concealment of "facts about her past" which would "not only seriously mar his standing in the business and social world," but also unfitted her for "the rearing of his children" by a former marriage, "two of whom were daughters, one of pre-adolescent, the other of adolescent years." Defendant was a widower. His first wife died on June 16th, 1938. His marriage to petitioner occurred on September 20th, 1939.

Concededly, petitioner's life had been one devoid of adherence to the conventions. In fact, it was characterized by a frequent disregard of legal and moral precepts in matters of sex. But defendant was aware of her sexual looseness. Indeed, he shared her weakness. They had antenuptial sexual

relations which began a few days after their first meeting and were continual until the performance of the marriage ceremony. Recognizing the situation, the master observed that defendant's inquiry of petitioner "could not have envisioned merely her chastity, for her 'easy virtue' was a matter of his immediate, personal and continued knowledge prior to his marriage to her;" but he concluded that petitioner's suppression of the particular circumstances of her relations with two men, *i. e.,* her misrepresentation of pregnancy to one as the fruit of their intimacy for the purpose of inducing payments of money and her entering into a ceremony of marriage with a married man (there was no finding that she was aware of the impediment), constituted "a fraud upon the defendant under the terms of marriage which he proposed;" that "the future well being and rearing of children of a former marriage, particularly when such well being and rearing of such children is made and accepted as a part consideration between the parties to another marriage," is "to be considered in adjudicating sufficiency of fraud in a suit to annul that marriage;" and that, though there was "sufficient fraud in so far as the rights of the defendant himself are concerned considering his business and social position," and notwithstanding "meretricious antenuptial relations with the intended spouse," not "flaunted before the knowing eyes of the children," defendant ought to have an annulment of the marriage "when that spouse has falsely represented or willfully suppressed facts which, as in the case *sub judice,* reasonably would or could reflect upon and mar the welfare of such children." Acknowledging that defendant, "in view of his own admitted premarital relations" with petitioner, "cannot be heard to complain of her illicit premarital sexual relations with others," the master found in the particulars mentioned "fraud that is neither the usual nor reasonably anticipated concomitant of such premarital relations."

It is to be said *in limine* that we are unable to accept the master's view that the evidence reveals non-consummation of the marriage. Antenuptial intercourse wholly aside, the evidence is convincing that there was coition after the ceremony. Concededly, there was access thereafter; and the proofs bring

such sexual congress within the realm of probability. The contrary inference would not be valid unless it derived from clear and convincing evidence.

Plainly, the foregoing considerations do not bring the case within *R. S. 1937, 2:50-1*. Nor do they warrant the annulment of the marriage under Chancery's general equity jurisdiction. Premarital incontinence is not a sufficient ground for the annulment of a marriage; and this is likewise true of the deficiencies of character considered by the master as precluding consent of the legal quality essential to such union. True, the law views marriage as a civil institution grounded in contract; but it is a contract *sui generis*. Marriage is the foundation of our society; and it is indissoluble except upon grounds laid down by the legislature. It is invested with a character and status independent of the will of the parties.

Apart from the statute, equitable jurisdiction to annul a ceremony of marriage for antecedent cause stems from Chancery's general authority to grant relief against contractual undertakings induced by fraud. There seems to be a contrariety of view among legal scholars respecting the classification of agreements thus tainted with fraud, *i. e.*, whether all such are lacking in genuineness or reality of consent, and therefore void *ab initio*, or are founded upon an intended manifestation of mutual consent induced by fraud, and so a contract voidable at the option of the defrauded party. *Anson on Contracts (Turck ed.)* §§ *206, 210, 245, 260 et seq.; Williston on Contracts (Rev. ed.)* §§ *20, 21.* Mr. Turck says that "the idea" which the phrases "reality of consent" and "unreal consent" seek to convey is that "under certain circumstances the law will not recognize as a genuine consent nor as a binding contract an agreement affected by mistake, misrepresentation, fraud, duress or undue influence;" that "a consent which the law does not recognize as making a binding contract is to some extent at least 'unreal;' " and that "consent" so induced is but an "apparent consent, an unreal consent." *Anson on Contracts, supra,* § *206, note.*

But the distinction is of no practical importance as regards the question *sub judice,* for, however classable, the annulment

of such marriage contracts is indubitably within Chancery's general equity jurisdiction. Mr. Bishop says that the "mutual consent" which is of the essence of marriage is non-existent where "the mind is overcome by fraud, by error, or by duress, so that in fact it does not consent to an apparent marriage," and therefore "the law will deem it to be no marriage; though, if after the thrall is broken it then freely consents, no repetition of the ceremony will be required to make it good;" and that it "may be termed void or voidable according to the meaning which we attach to these uncertain or variable words." *1 Bishop on Marriage, Divorce and Separation (1891), § 550, also § 461.* There is "a peculiar sort of voidable" in marriage law. *Ibid., § 255.*

Due to the nature of the relation, not all fraud in the consent serves to invalidate a marriage. Marriage has always been governed by considerations of public policy. While as a civil contract consent is essential to its constitution and subsistence, the rules applicable to ordinary contracts do not in their entirety govern in the law's treatment and appraisal of the marriage contract. There ensues from the mutual consent of the parties to such an agreement a status and relation that the law, in the public interest, deems indestructible except for the most weighty reasons. In an early case holding that the dissolution of the marriage contract for antecedent cause was within the general jurisdiction of equity, this court said of the marriage contract and of the sufficiency of the fraud to warrant such judicial action: "Most serious considerations of public policy and good morals affect it (the marriage contract), and demand that it should be indissoluble, except for the gravest causes. The mere presence of fraud in the contract is not sufficient to dissolve it. The fraud must exist alone in the common law essentials of it, and then not to have the effect of avoiding it against sound considerations of public policy. As already stated, antenuptial incontinence merely, though fraudulent, is not sufficient. Neither is the mere mistake of the husband as to the paternity of a child born after marriage, but begotten before by another, where he himself had been guilty of criminal lewdness towards his wife before marriage, sufficient. Neither are false representa-

tions in regard to family, fortune, or external condition, sufficient. In granting relief, courts should always be careful that no violence is done to the nature of the relation and to sound morals. It must be extraordinary fraud alone, that will justify an avoidance of the bond." The marriage contract "should not be vitiated even if fraudulent, when against 'good policy, sound morality, and the peculiar nature of the relation.' To be free from that restriction, the fraud must be of an extreme kind, and in an essential of the contract." *Carris* v. *Carris, 24 N. J. Eq. 516, 522*.

There is an obvious difference in quality between the fraud justifying non-performance of the executory agreement to marry and fraud sufficient to invalidate an executed marriage. Mr. Bishop says as to this: "Both natural reason and the reasonings of the law distinguish between an impediment which will justify a refusal to marry and one upon which a divorce can properly be founded; a small thing may suffice for the former, for the latter it should be weighty and grave. * * * If one has cheated another through a fraudulent contract of the ordinary sort, whether executed or not, only individual property interests are injured. No new status, the abrogation whereof would be disturbing to the community, has been established. Unborn children do not cry out from the mother's womb, demanding that they may not be bastardized, lose a father, and know only a disgraced mother. Hence the fraud which would vitiate the ordinary contract, even the executed one, should not, and in actual adjudication it does not, of necessity suffice to nullify marriage." *1 Bishop on Marriage, Divorce and Separation, supra,* § *454-5*. Again, in discussing the nature of the fraud which will vitiate the consent essential to a marriage contract, he says: "In that contract of marriage which forms the gateway to the marriage status, the parties take each other for better, for worse, for richer, for poorer, to cherish each other in sickness and in health; consequently a mistake, whether resulting from accident, or, in general, from fraudulent practices, in respect to the character, fortune, health, or the like, does not render void what is done." *Ibid.,* § *459*. These he regarded as in the category of "error *accidentalis*," and therefore inadequate:

"The nature of marriage forbids its validity to rest on any stipulations concerning these accidental qualities. Should the man, in words, agree with the woman to be her husband only on condition of her being so rich, so virtuous, so wise, so healthy, of such a standing in society; yet, should he then celebrate the nuptials on her representing herself to possess those qualities, while in truth she did not; still in the act of marriage he says to her, in effect and in law, 'I take you to be my wife whether you have the qualities or not, and whether you have deceived me or not.' In other words, he waives the condition. To carry such a condition into the marital relation would violate its spirit and purpose, and be contrary to good morals. The objects of marriage, rightly understood, transcend all considerations of the kind. * * * Here the law regulating the executed contract of present marriage differs from that governing the agreement of future marriage; for, in the latter, the parties to it so far stipulate concerning the accidentals as to enable either to avoid the contract where any fraud as to them has been discovered. To hold otherwise of fraud in present marriage would degrade a high and holy relation to the level of things of mere mercantile consideration." *Ibid.*, § *460*.

The law has always differentiated between fraud in the *essentialia* of the marriage relation and the "deceptive arts" to which the sexes all too frequently have recourse with a view to an advantageous marriage, *i. e.*, by placing their persons, characters and circumstances in a too favorable light. It has been said that, while such "partake of the nature of fraud," they do not serve to vitiate the marriage; otherwise, "the marriage contract, which in its original design and institution was to continue indissoluble during the joint lives of the correlates, and which is a main pillar on which society is founded," would be degraded "to a level with the most trifling bargains." *Benton* v. *Benton, 1 Day 111.* It is not "every error or mistake" under which a person labors as to the character or qualities of a husband or wife, "although occasioned by disingenuous or even false statements or practices," that will suffice for annulling a marriage. "In the absence of force or duress, and where there *is* no mistake as

to the identity of the person, any error or misapprehension as to personal traits or attributes, or concerning the position or circumstances in life of a party, is deemed wholly immaterial, and furnishes no good cause for divorce. Therefore no misconception as to the character, fortune, health or temper, however brought about, will support an allegation of fraud on which a dissolution of the marriage contract, when once executed can be obtained in a court of justice. These are accidental qualities, which do not constitute the essential and material elements on which the marriage relation rests. The law, in the exercise of a wise and sound policy, seeks to render the contract of marriage, when once executed, as far as possible indissoluble. The great object of marriage in a civilized and Christian community is to secure the existence and permanence of the family relation, and to insure the legitimacy of offspring. It would tend to defeat this object, if error or disappointment in personal qualities or character was allowed to be the basis of proceedings on which to found a dissolution of the marriage tie." *Reynolds* v. *Reynolds, 3 Allen 605.*

Fraudulent concealment of mere premarital unchastity has never been deemed a sufficient ground for nullification of the marriage. Antenuptial chastity is not an essential element of the contract of marriage. It is in the same category as other personal qualities. Concealment of pregnancy at the time of the marriage has a different aspect in the law: This on the ground that it enters into the very essence of the contract and the ensuing relation, since, if successful, it would compel the husband "to disown the child for his own protection," or impose upon him "the necessity of recognizing and maintaining the fruit of his wife's defilement by another," and of "having it partake of his inheritance." *Carris* v. *Carris, supra.* And there is another cogent reason: A woman so situated is incapable of performing the essential function of marriage. In the *Reynolds Case, supra,* a distinction was noted in this behalf between pregnancy and mere unchastity: "And as mere incontinence in a woman prior to her entrance into the marriage contract, not resulting in pregnancy, does not necessarily prevent her from being a faithful wife, or from

bearing to her husband the pure offspring of his loins, there seems to be no sufficient reason for holding misrepresentation or concealment on the subject of chastity to be such a fraud as to afford a valid ground for declaring a consummated marriage void. In regard to continence, as well as to other personal traits and attributes of character, it is the duty of a party to make due inquiry beforehand, and not to ask the law to relieve him from a position into which his own indiscretion or want of diligence has led him. Certainly it would lead to disastrous consequences if a woman who had once fallen from virtue could not be permitted to represent herself as continent, and thus restore herself to the rights and privileges of her sex, and enter into matrimony without incurring the risk of being put away by her husband on discovery of her previous immorality. Such a doctrine is inconsistent with reason and a wise and sound policy. * * * But a very different question arises where, as in the case at bar, a marriage is contracted and consummated on the faith of a representation that the woman is chaste and virtuous, and it is afterwards ascertained not only that this statement was false, but that she was at the time of making it and when she entered into the marriage relation pregnant with child by a man other than her husband. The material distinction between such case and a misrepresentation as to the previous chastity of a woman is obvious and palpable. The latter relates only to her conduct and character prior to the contract, while the former touches directly her actual present condition and her fitness to execute the marriage contract and take on herself the duties of a chaste and faithful wife. It is not going too far to say, that a woman who has not only submitted to the embraces of another man, but who also bears in her womb the fruit of such illicit intercourse, has during the period of her gestation incapacitated herself from making and executing a valid contract of marriage with a man who takes her as his wife in ignorance of her condition and on the faith of representations that she is chaste and virtuous. In such a case, the concealment and false statement go directly to the essentials of the marriage contract, and operate as a fraud of the gravest character on him with whom she enters

into that relation. As has been already stated, one of the leading and most important objects of the institution of marriage under our laws is the procreation of children, who shall with certainty be known by their parents as the pure offspring of their union. A husband has a right to require that his wife shall not bear to his bed aliens to his blood and lineage. This is implied in the very nature of the contract of marriage. Therefore a woman who is incapable of bearing a child to her husband at the time of her marriage, by reason of her pregnancy by another man, is unable to perform an important part of the contract into which she enters; and any representation which leads to the belief that she is in a marriageable condition is a false statement of a fact material to this contract, and on well settled principles affords good ground for setting it aside and declaring the marriage void." Pointing to the rule of the common law that, "if a man marry a woman who is with child, it raises a presumption that the child with which she is pregnant was begotten by him," Chief-Justice Bigelow further declared that it necessarily followed that if the man so situated "could not obtain a divorce on the ground of fraud," he "would be subjected to the painful alternative of disowning the child, and thereby publishing to the world the shame of her who was still to remain his wife, or suffer the presumption of legitimacy to stand, and admit the child of another to share in his bounty and receive support in like manner as his own legitimate children," and so there was no consideration of policy for sustaining the marriage under such circumstances.

Even in the case of concealed pregnancy, the husband is not entitled to such relief if he also has had intercourse with his wife before marriage, since he thereby acquired before the ceremony "full knowledge" of her unchastity, and thus was "put on his guard so that he cannot allege that he was induced to contract the marriage by such fraud and deceit on the part of the libellee as will enable him to avoid the contract." *Crehore* v. *Crehore, 97 Mass. 330.* And in *Foss* v. *Foss, 12 Allen 26,* relief was denied to a man who had married a woman with whom he had had premarital sexual congress, and of whose pregnancy he was aware, but relied on her assurance

that the child was his, although it turned out to be another's. Observing that the contract of marriage is one which, "from its peculiar nature and on grounds of public policy, the law regards as especially sacred and inviolable," and one not to be avoided for fraud unless it relates to the essentials of the marriage relation, the court said: "It appears that, after a very brief acquaintance with the defendant, during which he had visited her only two or three times, he had carnal knowledge of her person; that this took place between two and three months prior to the solemnization of the marriage; that he well knew before the execution of the contract by the marriage that she was pregnant with child, but was told by her that she was with child by him, and that he did not know or suspect that she had had sexual intercourse with any other man. We have therefore a case in which a man intermarried with a woman whom he knew to be unchaste, whom he had himself debauched, and of whose condition of pregnancy he was well aware. He took no steps to ascertain the truth of her statements concerning the paternity of the child, but, relying solely on her assurances on that subject, he entered into the contract of marriage. It seems to us that on these facts he was guilty of a blind credulity, from the consequences of which the law will not relieve him. His knowledge of the respondent's unchastity and of her actual pregnancy was sufficient to put a reasonable man on his inquiry." This general rule has been followed in our Court of Chancery. *Seilheimer* v. *Seilheimer, 40 N. J. Eq. 412; States* v. *States, 37 N. J. Eq. 195.* See, also, *Hoff* v. *Hoff, 162 Md. 248; 159 Atl. Rep. 591; 82 A. L. R. 528; Smith* v. *Smith, 171 Mass. 404; 50 N. E. Rep. 933; Westfall* v. *Westfall, 100 Or. 224; 197 Pac. Rep. 271; 13 A. L. R. 1428.*

The fraud that vitiates the marriage contract does not lend itself to definitive statement automatically resolving every case; and we have therefore quoted at length from authorities which in our view reveal the application of sound doctrine to particular facts and circumstances and serve to point the line of demarcation.

.Thus it is that the wife's imperfections of character are not grounds of nullity. And it ill becomes a husband who

has had such antenuptial sexual relations with his wife to say that she has thereby revealed her unfitness for "the rearing of his children" by a former marriage, and the union is for that reason a nullity. Such disqualification plainly does not concern the essentials of the marriage relation.

Decree reversed.

*For affirmance*—None.

