Sullivan,
March 1, 1932.

JESSIE ORAM HEATH *v.* EUGENE E. HEATH.

*Henry N. Hurd,* for the petitioner.

ALLEN, J. The case presents the issue how far bad character, bad conduct and material worthlessness, fraudulently denied to induce a marriage renders the marriage voidable at the instance of the defrauded spouse. The issue is one of difficulty and has far reaching bearings. If proof of the charges, collectively or separately, is held sufficient to authorize annulment, it is through an advance of judicial power not hitherto exercised and accomplished by a declaration of public policy in expression of views of social welfare.

Summarized, the charges of falsehood are of sober and industrious habits and sexual virtue in respect to character, of savings in respect to material worth, and of law abiding conduct when there had been a conviction for the crime of adultery. Admittedly so important and serious as to underlie the petitioner's consent to the marriage, is the fraud so material that the marriage may and should be annulled?

It is said in *Keyes* v. *Keyes*, 22 N. H. 553, 556: "Fraud is an element which vitiates all contracts, and may be of a character to vitiate, and will vitiate even the marriage contract." No rule or test is made in definition of the kind of fraud which will entitle the defrauded party to an annulment. But a test was undertaken in *Gatto* v. *Gatto*, 79 N. H. 177, 184, in this pronouncement: "As marriage is deemed to be a civil contract and not a sacrament, fraud in a material respect which prevents a substantial meeting of the minds of the parties in an intelligent agreement for marriage cannot be said to be immaterial, or beyond the province of the court to correct by a decree of annulment."

Thus defined the rule permits the avoidance of marriage for any fraud of the guilty spouse if it is important enough to be a substantial inducement of the marriage. It signifies no narrowing of the general principle of avoidance for fraud. It makes no discrimination between different inducements by which the fraud is accomplished. It would apply to promises of future conduct not intended to be kept when made.

Going further, the opinion declares in general terms that public policy "does not regard a fraudulent marriage ceremony as sacred and irrevocable by judicial action." It is conceded in the opinion that marriage is a contract "attended with many important and peculiar features in which the state is interested," and "is one of the fundamental elements of social welfare." It is maintained that its importance should make it "difficult to successfully perpetrate fraud and deceit as inducements to the marriage relation," rather than that the fraud should be "wholly disregarded by the courts." In con-

clusion of the argument it is said that "The successful perpetration of fraud is not . . . a subject for judicial encouragement . . . nor is the court authorized to legislate in favor of such a policy."

The reasoning comes to the proposition that the public concern in the marital status is such as to call for the annulment of all marriages tainted with "material" fraud. The public interest in the welfare of the institution of marriage is promoted by the erasure of such marriages. Not to cancel them is against the public interest because "Unhappy and unfortunate marriages ought not to be encouraged," and if judicial relief is not given, the courts are open to the charge of upholding wrong.

Carried to its logical conclusion, the case would appear to leave "material" fraud preventing a "substantial" reality of agreement to be determined as a question of fact in each case, by the rule it defines. The effect of the fraud in the particular case as well as its general nature would have large bearing. To some the fraud would be more serious than to others. The rule is so broad and general in its comprehensive scope that it leaves much to the discretion of the trier and practically each case would be largely decided on its own special merits. The uncertainties and discrepancies that would thus arise would produce an unsatisfactory situation both from the public's and the individual's standpoint.

In view of the insecurity and disturbance which the rule would seem to lead to, and in view of the serious doubts with reference to its statement of the public policy on the subject in its application to such cases, it is thought proper to consider if the reasoning of the case is to receive credit as accepted and established authority. The case was one of extreme urgency, and no such broad latitude for the play of fraud in affecting the validity of the marriage contract as the case holds is authorized, was necessary to reach the result of sustaining the annulment which the trial court had decreed.

The issue of what constitutes a voidable marriage is not readily determined, as is shown by a rather hopeless conflict of authority and a large variety of rules among the different jurisdictions. As the subject is approached and emphasized from the standpoint of contractual relations or from that of public interest, difference of opinion naturally appears. In the ascertainment of the extent and limits of the public interest varying conclusions are reached. It would seem that matters of doubt and of personal opinion are at times resolved into settled rules and principles of policy. Almost necessarily the conclusions are not uniform.

The courts have authority to annul void marriages. They also have some authority to hold a marriage voidable and annul it. But such authority is exceptional, and does not mean the right to hold a marriage voidable as though it were an ordinary contract.

It is said in the *Gatto* case that there is no public policy against the annulment of fraudulent marriages, as evidenced by the statutes, decisions and general consensus of opinion. Statutes and decisions are admittedly sources of the ascertainment of public policy, but general opinion or the state of the public mind as an independent matter of investigation has been questioned. It is said in *Spead* v. *Tomlinson*, 73 N. H. 46, 58, that public policy is "the policy of the state as evidenced by its laws," and that on the issue of a policy "the only matters which can be considered are its constitution and statutes and the provisions of the common law as evidenced by the decisions of the courts; for the common law, modified by the constitution and statutes of the state, is the law of the state." This limitation of evidence to show policy is followed in *Glover* v. *Baker*, 76 N. H. 393, 419. It therefore becomes necessary as a preliminary inquiry to resolve the conflict between the rule of these cases and the broader rule employed in the *Gatto* case.

In the statement that the common law, as modified by organic and statute law, is the law of the state, the common law, with its adaptability to change, is not fully defined. The constitutional enactment (Const., Pt. II, *art.* 90) that "All the laws which have heretofore been adopted, used, and approved, in the province, colony, or state of New Hampshire, and usually practiced on in the courts of law, shall remain and be in full force, until altered and repealed by the legislature; . . . ." did not perpetuate "any part of the common law incompatible with our institutions, or not adapted to our circumstances." *Lisbon* v. *Lyman*, 49 N. H. 553, 582, and cases cited. And while legislation "cannot alter by reason of time," "the common law may, since *cessante ratione cessat lex*." *Cole* v. *Company*, 54 N. H. 242, 285. When a rule is no longer "adapted to our circumstances," a change of circumstances, whether in a matter of policy or otherwise, invokes a change of the rule. And the circumstances, with their changes, are to be noticed.

It seems self-evident that law incompatible with our institutions or unadapted to our circumstances is against public policy. And it seems equally self-evident that the institutions and circumstances must be first known to tell what the policy is, in an original inquiry. The law to be declared is one that conforms with our institutions and

circumstances, and their determination is no more and no less than an ascertainment of public policy. The difference of phraseology represents no real difference of thought. When it is determined what the public interest requires, the rule of law respecting it is determined.

The early cases abundantly support this proposition. As far back as 1818, it was said in *Eustis* v. *Parker*, 1 N. H. 273, 278: "It is undoubtedly true, that the great body of the common law is in force here; but it is equally true that many of its principles have been rejected, as not adapted to the situation of the country." In *Houghton* v. *Page*, 2 N. H. 42, an early common-rule of interest was discarded on the principle that the only common-law rules here in force are those expressly adopted or those impliedly binding as being "applicable to our state of society and of jurisprudence, and founded on axioms of intelligent reason." In *Pettingill* v. *Rideout*, 6 N. H. 454, the court considered the English common-law rule deferring the enforcement of civil liability for a criminal act until the public justice was satisfied. The rule was abrogated as no longer one of policy, the court saying it was "very well satisfied the people of this state want no additional stimulants to prosecute offenders." And a new rule of policy was substituted. "To compel the injured party to wait . . . must be, as is very well known, in most cases to deny all remedy." Applicability to "the institutions and condition of the country" was made a test of subsisting common law in *State* v. *Rollins*, 8 N. H. 550; *Pierce* v. *State*, 13 N. H. 536, 542; *Currier* v. *Perley*, 24 N. H. 219, and *Dennett* v. *Dennett*, 43 N. H. 499.

The transition of expression, but not of thought, in the search to ascertain public opinion appears in more recent cases. In example, in *Kambour* v. *Railroad*, 77 N. H. 33, the "change in public opinion" towards the common-law relation of master and servant was given judicial notice, and its force in bringing about changes in that law, independent of legislative expression of it, was recognized. A similar notice of this subject of public thought was taken in *Clairmont* v. *Cilley*, *ante* 1, 3. In *Carter* v. *Craig*, 77 N. H. 200, 207, and in *Sundeen* v. *Rogers*, 83 N. H. 253, the court adopted new views of reasonableness based on changed industrial and social conditions and political theories, of which judicial notice was taken. The public view of what is right and wrong is practically that of what is and is not reasonable.

The virtual unity of adaptation to our institutions and conditions and of policy is substantially expressed in *Concord Mfg. Co.* v. *Robertson*, 66 N. H. 1, 7, in this language: "The immigrants brought, not

the whole body of written and unwritten laws under which they had enjoyed rights and suffered wrongs, but only such as were suited to their condition and wants, consistent with their new state of society, and conformable to the institutions they intended to establish, and the general course of policy they intended to pursue."

Since our common law is thus based on our needs when the constitution was adopted, the logic is that the needs were to be ascertained in order to declare what the law was. The law did not determine the needs, and hence did not show the needs until it was declared in recognition of them. A rule of policy being premised on the need for it, the rule cannot prove the premise until it has been otherwise established.

No court would hold that policy or needs do not become obsolete or change, or that new ones do not arise. However public policy may be defined, it is a principle adopted because of some prevailing public need. If the need disappears or is changed, the principle should no longer be in force or remain unchanged. It follows that the state of the public mind must be noticed and given recognition from sources other than legislation and decisions whenever a change in it has not received legislative recognition. The function and duty of the courts to adopt public policy not in conflict with the organic or statute law assume an inquiry from other sources as to what the policy is, and a change of policy is to be similarly ascertained. The law resting on the policy, the withdrawal of the policy should be ascertained as readily as its existence, and a change in the law made to conform with the cessation or reversal of the policy, in cases where legislation is silent. The cases limiting consideration to written and unwritten law leave out of account changes in public needs not dealt with by legislation but to be dealt with by the common law, since the changes can only be known by taking notice of the state of the public mind. The inclusion of general public opinion as evidence to show public policy in addition to legislation and decisions, as announced in the *Gatto* case, is more logically supported than its exclusion, and, it would seem, better sustained by authority. The primary source of public policy as representing popular views or its reinforcement in its grant of legislative recognition is not material once it is ascertained.

It is accordingly deemed that the rule employed in the *Gatto* case is the correct one, as necessary to give full scope to the proper consideration of questions of public policy.

The issue then arises as to the validity of the conclusions therein drawn from the evidence thus available.

The duty of the courts to declare and apply public policy is not doubtful. But in determining it they are not to set up their own standards of right and wrong or to give to their personal views and opinions the force of law. The standards prevailing in the state are in issue.

In a sense all rules of law are rules of policy. They are in the public interest and of public concern. But as the term is employed, a rule of public policy is an exception to general legal principles. There is a particular public interest demanding the exception. "In substance it may be said to be the community common sense and common conscience, extended and applied throughout the state to matters of public morals, public health, public safety, public welfare and the like. It is that general and well-settled public opinion relating to man's plain, palpable duty to his fellow men, having due regard to all the circumstances of each particular relation and situation." *Pittsburgh &c. Co.* v. *Kinney*, 95 Oh. St. 64, 68. It has also been defined as "a principle of judicial legislation or interpretation founded on the current needs of the community." XLII Harv. L. Rev. 92.

The idea of public policy may be loosely expressed in the generalization of the greatest good for the greatest number, or more definitely in the platitude that "No one can lawfully do that which has a tendency to be injurious to the public, or is detrimental to the public good." In some ways it is comparable with the vague test of the duty of one individual to another, *sic utere tuo ut alienum non laedas.* But it implies three things, *a*, a law, *b*, declared in view of a public interest affected, and *c*, with the public interest ascertained as a question of fact. A rule of public policy is a law, but, as already suggested, the policy is first to be shown to be established before it is to be given the force of law. And this is to be done in a manner similar to that by which foreign law is to be ascertained, as prescribed in *Saloshin* v. *Houle, ante,* 126. The treatment of the issue of public policy as one of ordinary law, as though it were to be determined by precedents and reasoning leading to a logical conclusion, ignores the distinction between the actual and a proper public opinion. In most cases there may be no doubt about the state of the public mind on questions of right and wrong affecting the public interest, but when it is doubtful the viewpoint of what is thought to be in the public interest is apt to be adopted and that of what the public mind in fact thinks about it overlooked. The judicial mind and the public mind are not always the same.

The state of the public mind on the subject of the public policy to annul fraudulent marriages, unreflected by decisions and statutes,

appears uncertain. Thus to declare it seems assertive and without probative support. For the courts to take judicial notice of popular opinion and thus deduce a public policy, there should be a substantial freedom of doubt about it. Conceding that modern days show an advancing march of liberality towards the freedom of the marriage relation, it is not to be said how far the advance has gone or how generally the march is joined in, except as legislation may show it in terms or spirit. There are those whose numbers may not be few who believe the march has gone far enough if not too far. In the diversity of thought and views on the subject no established sentiment of general prevalence can be found to entitle it to declaration as a definite policy with fixed and set bounds. Decisions and legislation alone must here be determinative of it.

It is to be observed that legislation has been necessary to establish changes in the attributes of the marital status. The legislature has undertaken to carry out by statutes "the general consensus of opinion" on the subject, and it is left to the courts to declare the opinion as the statutes disclose it and adopt it as a policy. The policy thus disclosed by the terms, purpose and spirit of the legislation prevails and governs as law.

In respect to decisions, nullity cases here are few. In *True* v. *Ranney*, 21 N. H. 52, a marriage was held void by reason of the petitioner's incapacity to marry. It was a Vermont marriage and the law there was enforced. The case has no local bearing.

In *Keyes* v. *Keyes*, 22 N. H. 553, decided in 1851, nullity was decreed on the twofold ground of the petitionee's incapacity and the fraud of third parties in encouraging the marriage and concealing their knowledge. In its untenable proposition that a party to a contract may assert its invalidity when its inducement is the fraud of others than the innocent defendant, its force as authority is shaken. And it is to be noted that the case disregards the distinction between void and voidable marriages. In the case of the void marriage there is no marriage, and a suit for its nullity is only of service as an *in rem* proceeding to clothe the fact of nullity with the security of a judgment. The decree does not affect status but merely declares and settles it judicially. In the case of the avoidable marriage, there is a marriage. The marriage relation exists and continues until the decree of avoidance, although the decree may have retroactive effect to make it void from its beginning.

In the dictum in the *Keyes* case that if one knowingly marries a person incapable of marrying, the marriage would be regarded as valid

except at the latter's election, the social interest against the maintenance of such a relation is given no consideration. And nowhere in the opinion is the public concern in the marital status taken into account. Since the fraud related to the fact of incapacity which made the marriage void without a decree, the case deserves no weight as authority respecting voidable marriages.

The *Gatto* case must stand as the first one fairly dealing with such marriages in this state, and its reference to decisions to show public policy on the subject is understood to refer to the general state of the common law here in force. If reference to the decisions of other jurisdictions was intended, their conflict and the diversity of opinion they disclose yield no showing of any settled and definitely prescribed policy here in force.

The law's present day disregard of marriage as a sacrament is not doubtful. But no less free from doubt is its recognition of marriage as creating a status containing more than an ordinary contractual relationship and not subject to the ordinary rules of contract law. In the ordinary freedom of contract terms may go to any extent of legal agreement. In the marriage contract no terms adversely affecting the status are binding or valid. *Foote* v. *Nickerson*, 70 N. H. 496, 518. To give it contractual treatment generally because it has some contractual aspects is to overshadow the greater importance of its institutional character. In any event the legislative control and regulation of the status is not to be assumed by the courts. Their duty to keep in step with the spirit of legislation and to follow it does not imply a right to guide it or to create its spirit.

At common law husband and wife could not contract with each other even in matters not directly affecting the status. This was under a theory of single legal personality which legislation has done away with. But the legislation has permitted mutual contracting only so far as it has been thought to better the status.

Likewise the relation at common law made inapplicable the general law of torts between married persons under this theory of legally unified personality. It required legislation to open the doors to such litigation. The legislation has been broad and sweeping. *Gilman* v. *Gilman*, 78 N. H. 4; *Maryland &c. Co.* v. *Lamarre*, 83 N. H. 206; *Dunlap* v. *Dunlap*, 84 N. H. 352, 354. If it might seem a novelty of litigation for one party to a marriage to sue the other in deceit for fraud in inducing the marriage, it would yet seem to be within the legislative expression of purpose to permit it to be done, under the authority of these cases in interpreting the legislation. But remedy

of damages for the fraud does not necessarily signify the usual alternative remedy of restoration through avoidance of the fraud. The remedy of damages is not regarded as hostile to the maintenance and stability of the relation. The remedy of avoidance results in its destruction, and permission for the former does not by itself imply permission for the latter. The differences in consequence are too great.

Not all wrongs that are causes for divorce give the injured party a right to sue for damages for the wrong instead of seeking the divorce. Pecuniary compensation for such wrongs is not given unless indirectly through orders for support and alimony, and in general damages for fraud are the only remedy for it in the absence of a legislative authority for other relief. It is not enough to say that the marriage contract is of a civil nature.

The divorce laws indicate an adjustment between the public concern for the stability of marriage and the welfare of the individual. The contributions of sacrifice to the public good that an injured party must make are far less than formerly. It is recognized that in large measure the welfare of the individual is that of the public, and it is thought that the hardship of marital wrong should not be required to be endured beyond the limits which have been fixed. Public policy in this respect has always been a matter of legislative determination, and to be consistent the courts should no more undertake to fix and set the limitations of the contract in its formation than in its operation. The contract relates to status, and if it may be dealt with by the courts according to their views and notions of policy, or even according to their ascertainment of public thought, there will be judicial legislation on a subject of public concern the incidents of which are understood to be peculiarly if not exclusively for the legislature to determine. It may be said to be a well settled policy that the courts shall not undertake to regulate the marriage status.

If under the viewpoint of treatment as a contract, marriage may be the subject of judicial regulation, no logical argument can be made against the annulment of a marriage for an essential but innocent mutual mistake. How, for example, can it be said that the minds of the parties have met in a real marriage if children are expected and understood to be born of it but this turns out to be impossible by reason of the physical incapacity of one of the parties to that end? It is believed that in the absence of fraud no court would grant annulment, although a fundamental purpose of marriage is defeated and although legislation may authorize a divorce for the impediment.

The law seeks to discourage "unhappy and unfortunate marriages." But as between a policy of easy escape and one of restriction tending to caution in entering the relation and good conduct during it the courts may only follow the legislative expression of policy.

Liberality of divorce legislation shows no purpose to put marriages on the plane of ordinary contractual relations. Divorce is allowed for some, but not for all, breaches of marital obligation. If a libelant must endure three years of drunkenness before obtaining a divorce, or can maintain a libel for the commission of crime by the libelee only when the crime is a felony and imprisonment follows conviction for it, it is not easy to perceive that legislation has evinced a spirit in favor of a policy by which nullity is to be decreed for fraud in the denial of pre-marital drunkenness or of crime not punished as felonious. Ordinarily premarital conduct has less to do in affecting the relation than conduct during it. To grant nullity merely because of deception regarding past conduct would in many cases in practical effect extend the divorce legislation far beyond its limits and restrictions.

Termination of the relation by divorce and its avoidance by annulment enjoy the common outcome of freedom from the status. The implication is strong that aside from putting in the form of a judgment marriages that are absolutely void the courts should only under very exceptional conditions annul marriages on a theory of their standing as contracts. They are not to be avoided for fraud because ordinary contracts may be. It must further be shown that there is a public policy to apply ordinary contract law, and this is done only when it appears that it is subversive of the public interest not to do it.

On this ground the result in the *Gatto* case may be upheld. All will agree that when by fraud premarital conditions are concealed or denied and are of such a nature as to make normal marital relations so morally impossible that no one could be reasonably expected to endure their continuance, the public interest to keep the parties married to each other is at an end, and ordinary contract law may have its day. To this extent public policy may be declared and enforced without legislative disclosure of it. "It must be extraordinary fraud alone, that will justify an avoidance of the bond." *Carris* v. *Carris*, 24 N. J. Eq. 516. "The fraudulent representations for which a marriage may be annulled must be of something essential to the mariage relation—of something making impossible the performance of the duties and obligations of that relation or rendering its assumption and continuance dangerous to health or life." *Bielby* v. *Bielby*, 333 Ill. 478.

In the *Gatto* case the fraud was a denial of pre-marital incest. Discovery naturally making it impossible for the petitioner to live with the petitionee as his wife and thus creating a situation destructive of the public concern for the maintenance of the marriage, public objection to avoidance of the marriage was properly held to be withdrawn. To continue the status in such a situation tends to defeat the policy of upholding it.

But the *Gatto* case goes further and holds all material fraud substantial enough to prevent a meeting of the minds sufficient. This virtually embraces all ordinary fraud. Under ordinary legal principles fraud has vitiating effect. But an act done intentionally is not in fact a nullity, whatever the reasons or inducement for it, and the law recognizes the reality of the act. Fraud may not be pleaded against innocent third parties so as to pass and transfer the consequences of the wrong to them. And in like manner it may not be pleaded against a public interest. In neither situation does the denial of the plea uphold wrong.

Incidental to public policy is the principle that individual hardship must be endured for the sake of the common good. This is and always has been the common-law view. "On grounds of public policy there are and always will be, on the one hand, many cases in which persons damaged may recover compensation from others whose conduct was morally blameless, and, on the other hand, many cases in which persons damaged cannot obtain compensation even from those whose conduct was morally most reprehensible." Prof. *Ames*, XXII Harv. L. Rev. 109.

Also, the principle does not admit of relief in cases of special hardship in special cases. If the particular form of fraud produces greater distress in some cases than others, recognition of the difference would lead to uncertainty and confusion. "It would be futile to attempt to deduce from these cases a rule as to what matters are 'essential or material to the marriage contract,' but they clearly indicate that what is 'essential or material' must be so with reference to every marriage contract." *Bannon* v. *Bannon*, 50 Wash. L. Rep. 22.

That the principle should be modified and relief given from such hardship as a betterment of the marriage institution is an issue of policy, and the policy should be adopted only when it has received legislative endorsement or is undoubted. The conflict of public opinion is too unsettled for the courts to determine it or to adopt their own views on the subject.

In general, the legislature declaring the policy, the courts may grant

the relief for which it has provided, but they may not say what relief should be provided. The marital status may be changed in its conditions and obligations only in the exercise of the police power vested in legislative tribunals. The power may not be exercised by the courts through a declaration of a change of public policy.

General jurisdiction to decree nullity when not conferred by statute seems to have been assumed somewhat arbitrarily, without regard to its limits, and without recognition of its working as a regulatory supervision of the status itself.

The ecclesiastical courts in England were alone vested with power to decree the invalidity of marriage contracts until nearly a century ago, and their action was governed by church policy rather than by state or public policy. The church policy was thus that of the state, so far as the state had any. In those courts no decrees of nullity were granted in distinction from decrees of divorce, and all marriages which were dissolved were regarded and treated as voidable. No common-law or equity jurisdiction to render a decree of avoidance was brought to this country in the colonial days, because there was none. The temporal courts in England could find a marriage to be void and treat it as such, but only in a collateral way.

The clause of the state constitution (Const., Pt. II, *art.* 76) vesting jurisdiction in the superior courts over "all causes of marriage divorce and alimony" was construed in *Bickford* v. *Bickford*, 74 N. H. 448, 452, to include nullity proceedings as being marriage causes. But in *Parsons* v. *Parsons*, 9 N. H. 309, 318, this clause was said to bestow only a transfer of such jurisdiction as had existed in the provincial assembly and the governor and council. No "new rules in relation to marriage, or its dissolution, or the maintenance of married women" were created.

In 1791 a divorce law (5 N. H. Laws, *p.* 732) was enacted. It defined incestuous marriages, and authorized divorce for them and in cases of polygamous marriages, as well as on other grounds. No reference to nullity is found in the statutes or decisions until the Revised Statutes of 1842 (*c.* 148), when it was provided that incestuous and polygamous marriages should be void "without any decree of divorce or other legal process" and that in case of doubt as to the void character of a marriage or as to the effect of any former "decree of divorce or nullity between the parties" a decree of "divorce or nullity" might be pronounced. It would seem that the statute did not do more than to make incestuous and polygamous marriages wholly void instead of only voidable as they had hitherto been.

In *True* v. *Ranney*, 21 N. H. 52, 53, decided in 1850, reference is made to the foregoing enactment and it is said that while "no mode" is prescribed by the statute "in which proceedings shall be instituted and carried on, for the purpose of procuring a decree of nullity," the court's power to make such a decree and regulate the mode of procedure is not to be doubted. The case assumes this to be the law on the strength of a statement from Kent's Commentaries, which on examination appears to have only a New York statute to support it.

Thus, although the legislature here had done no more than to provide that in certain cases the decree might be of nullity or divorce where formerly it was only for divorce, a general jurisdiction to deal with the status of the marriage contract was assumed. While the legislature recognized that there had been decrees of nullity, the implication of the legislation is that there was doubt as to their validity. The legislation provided for the removal of the doubt, but there is nothing to show that the authority given to grant decrees of nullity included authority to determine the grounds for nullity.

In dealing with the incidents of the marriage contract the marriage relation is necessarily a matter of treatment. The contract changes "the relation of the parties to the community." *Londonderry* v. *Chester*, 2 N. H. 268, 281. If it is a contract "to be regulated ... as to its continuance and obligations ... by the general provisions of the municipal law" (*Clark* v. *Clark*, 10 N. H. 380, 383), the character of the contract in its making is a matter of regulation as much as other incidents attaching to it. To determine the character of the contract and its incidents is to affect the maintenance of the relation and in some measure if indirectly to assume its regulation and control. The incidents of birth have bearing on later life. When a marriage is held voidable, the rights and duties of the parties in the relation are passed upon. An indirect entrance into some part of the field of police power is thus accomplished, and a public policy declared which may be only conjecturally true.

The legality of the marriage contract is for the courts to determine, but they are to enforce, and not ordain, the tests of legality. The question whether or not the marriage relation has been entered into indissolubly and without escape is to be settled by policy, and the settlement is an exercise of regulation. The public interest in the relation covers its inception as well as its ensuing existence. Its regulation in finality must be legislative.

When a marriage is dissolved, whether by divorce or annulment, the conditions and incidents of the status are to be investigated to

say if under the facts of the case the dissolution is permitted. But it is essentially a function of regulation to say what facts will authorize dissolution. To do so under the power of annulment does not transform the real character of regulation into one of judicial decision only. The form loses sight of the substance. "As long as the matter to be considered is debated in artificial terms there is danger of being led by a technical definition to apply a certain name, and then to deduce consequences which have no relation to the grounds on which the name was applied." *Guy* v. *Donald*, 203 U. S. 399, 406.

The courts in assuming general jurisdiction over the subject of marriage annulment appear to have overlooked the regulatory features involved. Dissolution by divorce may be granted only for statutory reasons. For the courts to invent new grounds would be to legislate. In dissolution by nullity determination of the grounds for it would also seem to amount to regulation and an exercise of legislative power.

The exceptional cases of extreme hardship admit of relief because the social purposes and welfare of marriage undoubtedly demand it. Public opinion in that respect has expressed itself, the policy adopts it, and the relief has the stamp of implied legislative authorization. It enforces a regulation already created by common acceptance and approval. If it is an intrusion upon legislative power in debatable territory, it is too strongly entrenched in the favor of general recognition and understanding to be now questioned. But it does not justify further encroachment.

Conceding that judicial power to declare public policy unsupported by legislative announcement of it results in an indirect exercise of the police power, the policy must be based on a "thoroughly developed, definite, persistent and united state of the public mind." As already said, there must be no substantial doubt about it. The regulation of the status of marriage has always been understood to be generally beyond the scope of judicial power. Exceptions are few and are to be justified only because of a pressure of public opinion showing a policy too authentic and insistent to be disregarded.

It is not deemed that the fraud practiced on the petitioner here is so serious as to bring it within the exceptional situations in which authority to annul may be exercised. Whatever the differences in definition of the kind and nature of fraud required to warrant an annulment, deception by one of the parties as to character, morality, habits, wealth, or social position is generally held insufficient. *Robertson* v. *Roth*, 163 Minn. 501; *Beckley* v. *Beckley*, 115 Ill. App. 27; *Williamson*

v. *Williamson*, 34 D. C. App. 536; *Chipman* v. *Johnston*, 237 Mass. 502; *Wier* v. *Still*, 31 Ia. 107; *Wells* v. *Talham*, 180 Wis. 654; *Oswald* v. *Oswald*, 146 Md. 313; *Browning* v. *Browning*, 89 Kan. 98; *Nelson* v. *Brown*, 164 Ala. 397; *Williams* v. *Williams*, 32 Del. 39; *Trask* v. *Trask*, 114 Me. 60; *Bannon* v. *Bannon*, 50 Wash. L. Rep. 22; *Smith* v. *Smith*, 8 Ore. 100; *Leavitt* v. *Leavitt*, 13 Mich. 452; *Meyer* v. *Meyer*, 7 Oh. Dec. Rep. 627; *Allen's Appeal*, 99 Pa. St. 196.

*Petition dismissed.*

All concurred.