George H. WOY, Respondent,

v.

Linda L. WOY, Appellant.

No. WD 38277.

Missouri Court of Appeals,
Western District.

Oct. 6, 1987.

Joan Krauskopf, University of West Virginia Law School, Evansdale Campus, Morgantown, W. Va. and J.C. Hambrick, Jr. and Jane Pansing Brown, Kansas City, for appellant; Schulz, Bender, Maher & Blair, of counsel.

John R. Shank and Thomas E. Hankins, Gunn, Hall & Stahl, Gladstone, for respondent.

Before PRITCHARD, P.J., and MANFORD and BERREY, JJ.

PRITCHARD, Presiding Judge.

On November 29, 1984, as petitioner, George H. Woy, filed petition for dissolu-

tion of marriage against Linda Louise Woy. She filed her answer and a counterclaim on December 27, 1984, admitting his allegation and affirmatively pleading that the marriage was irretrievably broken. George filed a reply, joining the issues for dissolution. Then, on March 5, 1986, after Linda's deposition was given, George filed a motion to amend his petition for dissolution by adding a count (Count II), seeking annulment. The motion alleged that on March 2, 1986, Linda gave her deposition in which she admitted that she had had a venereal disease [there was no evidence of that allegation], had engaged in a lesbian relationship prior to the marriage, and she also pleaded the Fifth Amendment, and refused to answer questions concerning her use of illegal drugs, such as cocaine, amphetamines, LSD and marijuana. George alleged that if he had known of these matters he would have refused to marry Linda (the marriage having occurred on March 29, 1980).

The motion to amend was sustained and Count II was filed, which alleged: That at the time of the marriage ceremony, George was unaware that Linda had engaged in a lesbian affair with another woman; that she had suffered from a venereal disease; and she had a dependence on illegal drugs, including, but not limited to, cocaine, LSD, marijuana and amphetamines; and had he known of these facts at the time of the marriage, he would have refused to have married respondent. George further alleged that the facts were material touching upon vital aspects of the marital relationship, and that Linda, "in concealing these facts from petitioner, acted in a fraudulent, malicious and willful manner with the specific intent to deceive and defraud petitioner." It was prayed for an order of the court declaring the purported marriage to be null and void and of no binding force and effect from the time it was pretended to be solemnized.

On the annulment issue, this evidence was adduced: Shirley Jean Charlton testified that she first met Linda Woy about six years ago. Prior to her marriage with George in 1980, she and Linda had intimate physical contact at Shirley's home in Over-land Park, Kansas, the intimacies being initiated by Linda. A year or more later there was another intimate contact between Shirley and Linda which was initiated by a gentleman. About three years ago, during a discussion, Linda told Shirley about another lesbian affair in which she was involved with another woman and her husband. At Linda's invitation, Shirley went to bed with George. During the marriage, Shirley observed Linda performing oral sex on another man, who was Joe Simon. About three years ago, from January through March, Shirley went to bed with George and Linda three times. Shirley also had sex relations with George on other occasions. No lesbian activities took place in front of George.

Mary Jane Kelly, a neighbor of George and Linda, testified that in the course of the past five or six years, Linda told her that if George had known about the things she had done in the past, everything, he probably would not have married her. Linda also told her that she knew George had a girlfriend who used to be her lover, and she said, "The joke's on him". About three years prior, Linda brought a white powder to Mary Jane's home, put it on a little piece of paper on the kitchen counter, divided it into two lines, and put one end of a straw in her nose and the other end on one of the lines. One of the lines was supposed to be for Mary Jane, but she was afraid of it, so Linda took the other line. When Mary Jane asked Linda how she afforded cocaine, she said she had friends. On one occasion, Linda came to Mary Jane's home wearing a beaver coat, which she opened and showed Mary Jane and her husband that she was naked from the waist up. On another occasion, in 1981, Linda stood naked in front of them before she got into their jacuzzi. On recall, Mary Jane testified that in the summer of 1985, she saw Linda and George's younger daughter, Kimberly, swimming nude in the pool. They got out of the pool two or three times, stood side by side, and hugged for about thirty seconds. A male workman, whom they were aware of, was pouring concrete about ten feet away.

Theresa Ann McKinley knew George and Linda. On one occasion, when on vacation, Linda was smoking marijuana. Linda told Theresa that she had an affair with another man and with a woman.

Linda told George's daughter, Piper Dawn Woy, that she enjoyed using drugs, "that she'd used many. She'd shot cocaine before. That she enjoyed smoking pot, and that she would go over to friends' houses to party". She also said that some of her close friends were drug dealers. She had to be careful when she used drugs because George did not condone it and should not know anything about it, so she would have to go other places to do it. Linda told her she would go to gay bars while she was married to George, "and I believe before". On one occasion, when Piper's friends, Susan Cunkle and Jeff Martin, were in the jacuzzi, Linda pulled off Susan's swim suit.

These admissions in Linda's deposition were read into evidence: She had a lesbian affair with Shirley Charlton prior to her marriage to George, and she doubted that she told him about it. She refused to answer questions about use of illegal drugs, amphetamines, LSD and marijuana on the grounds that the answers would incriminate her. At trial, she denied that she was a lesbian, but admitted again the sexual contact with Shirley prior to the marriage, involving the genitals of one person and the mouth, tongue, hand or anus of another person of the same sex, and she did not tell George about it before the marriage. After she married George, she had a lesbian affair with Shirley with George there. After the incident, when she and Shirley went to bed with George (during which, according to Linda, lesbian activity occurred), she told George, in 1983, about the prior encounter with Shirley, and Linda and George continued to have normal sexual relations. She denied the swimming pool incident related by Mary Jane Kelly.

Joe Simon denied that he had sexual relations with Linda during her marriage, but he had known her about 20 years and had engaged in sex with her. He witnessed Linda and Shirley participating in a lesbian affair about seven years ago, which was Shirley's idea—she even brought a gift.

George H. Woy testified that he is an orthopedic surgeon in Liberty, Missouri, with a gross W–2 income in 1984, in excess of $500,000. He denied that he knew of Linda's lesbian past, or of her drug usage prior to the 1980 marriage, and testified that if he had known of those things, he would not have married her. In his deposition, he testified that about three years before and after the threesome in bed incident, he saw Shirley and Linda sitting in bed watching TV and giggling. Shirley told him that she and Linda had "done this" before the marriage and afterwards, and then he did not go out with (Shirley?) anymore, "and that's when I realized that my wife was bisexual."

The trial court found these facts: The parties were married March 29, 1980; petitioner (respondent here) is a long-standing resident of Clay County, and has practiced his profession as an orthopaedic surgeon continually; prior to the time of marriage respondent (appellant here) frequently used such illegal drugs as marijuana, cocaine and LSD, which she concealed from petitioner, who, if he had known of the drug use, would not have married her; prior to the marriage, respondent engaged in lesbian affairs which she concealed from petitioner, and had he known of the lesbian affairs, he would not have married her; unknown to him, she frequented gay bars prior to the marriage, and told their mutual friends of lesbian affairs and drug use; she removed the clothing of a female friend of his daughter while the friend was a guest in the Woy home; she caressed his daughter in the nude in front of workmen; she exhibited herself nude from the waist up, while wearing a beaver coat, in front of neighbors; she used cocaine and marijuana in front of friends and associates, and requested they not disclose this information to him; he did not discover her lesbian tendencies until only several weeks prior to the March 17, 1986, hearing; he has not used illegal drugs or condoned her use of them; and that credibility should not be given to the testimony of Linda Woy or to Joe Simon. It was concluded that an unfa-

vorable inference should be drawn against Linda Woy by reason of her refusal to answer questions on self incrimination grounds; and that her concealment of her pre-marital lesbian affairs, and her pre-marital use of drugs, constituted fraudulent and material concealments which pertained to the marriage relationship, and which entitled him to annul the marriage. It was ordered that the marriage be annulled and the petition and counterclaim for dissolution of marriage be dismissed.

Respondent has filed a motion to strike the brief of Amici Curiae, Women's Legal Defense Fund, NOW Legal Defense and Education Fund, and American Civil Liberties Union of Western Missouri, upon the ground that it fails to set forth a fair and concise statement of the facts relevant to the questions presented for determination without argument. The brief has been examined and it does fairly set forth the facts. The motion to strike is overruled.

Appellant's first point is that the trial court was prohibited from granting the annulment because respondent, upon learning that appellant was a lesbian and used illegal drugs, ratified the claim of fraud by continuing the marital relationship. She bases her claim of ratification upon this deposition testimony of respondent: " 'And then, finally, it started dawning on me that this is not something that was new for Linda. And then Shirley told me that they had done this before we got married and that after we got married, that she and Joe Simon would go over to Joe's house and have intercourse and a few other things. And then I didn't go out with her anymore. And that's when I realized that my wife was bisexual.' "

■ Respondent's deposition testimony does not amount to an admission that he was aware any time before appellant's deposition was given on March 2, 1986, that she had engaged in lesbian affairs prior to the marriage. On March 2, 1986, the petition for dissolution was pending and the parties had separated. The deposition testimony reveals nothing about when Shirley told respondent "that they had done this before we got married". Rather, her testi-mony at trial that at the time that the dissolution proceedings were going on, she told respondent's attorney, "what was going on or what you claimed occurred between you and Linda", and it was the attorney who asked her to come and testify. The only inference, under all the facts, is that the time when respondent realized that his wife was bisexual was on March 2, 1986, when appellant's deposition was given, which accords with his trial testimony as to that time, and it is not inferable that respondent realized in 1983 that his wife was bisexual, and despite that knowledge, he continued to cohabit with her for the next three years, as stated in appellant's brief.

Immediately upon learning of appellant's pre-marital lesbian activities, respondent sought to amend the dissolution petition on March 5, 1986. He did not, after acquiring that knowledge, cohabit with appellant, and therefore did not condone, ratify or waive the same. The questions in this case are whether appellant's known lesbian activities, under the facts of this case, created an affirmative duty on her part to reveal the same to respondent, and whether those known activities prior to the marriage went to an essential element of the marital relationship. See generally, 37 Am.Jur.2d Fraud and Deceit, §§ 145, 146, p. 198, et seq.; and 4 Am.Jur.2d Annulment of Marriage, § 13, p. 448, where it is said, "Public policy demands that integrity of the marriage contract be preserved so far as possible, and fraud necessary to avoid a marriage must be such as is deemed vital to the marriage relationship." This concept was carried into the case of *Watson v. Watson*, 143 S.W.2d 349, 350[1–2] (Mo.App. 1940), where the fact that a wife misrepresented and concealed from her husband that she was suffering from syphilis was shown by clear, satisfactory and convincing evidence, the court saying, "Such a fraud pertains to an essential of the marriage relationship and obviously entitled plaintiff to an annulment of the marriage. (Citing cases and authority)." See also the annulment case of *Kshaiboon v. Kshaiboon*, 652 S.W.2d 219, 220 (Mo.App.1983), where the defendant lacked the physical and mental

capability to engage in normal sexual relationship with plaintiff, and his only sexual activities with her were of the unnatural type, which were known to him prior to the marriage and which he concealed from her, the court saying, "The sexual relationship is an essential element of the marital relationship and defendant's concealment of his limitations and preferences in that regard justified an annulment." Note also *Santos v. Santos*, 80 R.I. 5, 90 A.2d 771 (1952), a divorce case which had an additional (statutory) ground for relief that the marriage was void or voidable because the wife refused to have normal sexual intercourse, and wanted to engage only in unnatural intercourse, and after three days without consummation, she wilfully left the husband and went to live with a girlfriend of questionable reputation, for whose love she expressed a preference. Although the court affirmed the denial of a divorce, it held, 90 A.2d at page 774[6, 7], that the evidence showed that before and at the time of the marriage the wife knowingly and deliberately concealed from the husband her intent not to consummate the marriage and her design to engage only in abnormal conduct that was repugnant to and destructive of the basic purpose and terms of the marriage covenant, and that the trial justice erred in granting the petition on the ground that the marriage was originally void under the statute.

■ As appellant states, there was no evidence that she was addicted to drugs, or that she was dependent upon them. There is, however, evidence that appellant used drugs, sniffing cocaine in the presence of Mary Jane Kelly, to whom she stated she had friends to afford her cocaine; appellant smoked marijuana in the presence of Theresa Ann McKinley; and she told respondent's daughter that she enjoyed using drugs; she had used many; had shot cocaine before; and smoked pot, going over to friends' houses to party; some close friends were drug dealers; and she had to be careful when she used drugs because respondent did not condone it. Appellant took the Fifth Amendment when asked about her use of illegal drugs, which created an unfavorable inference against her

on that issue. *Harwell v. Harwell*, 355 S.W.2d 137, 141[1] (Mo.App.1962). Her concealment of her drug usage before the marriage is shown by the testimony of Dr. Ross Eugene Woody, whom she told about her usage, and that she was not able to openly do drugs because respondent was adamantly against that use and did not want drugs around the house or any place around him. It is doubtful that appellant's drug usage, absent addiction, standing alone, would be grounds for annulment, and there is no showing that it would affect respondent's license to practice his profession, although if generally known in the community, it might affect his reputation. See *Husband v. Wife*, 257 A.2d 765 (Del. Super.1969), where the evidence did not establish that the wife was an addict, but only that she had been convicted of a misdemeanor in possessing drug paraphernalia, and had periodic disabling usage of drug, held not to be sufficient to establish fraud which went to the very essentials of the marriage relationship. But see also *Costello v. Porzelt*, 116 N.J.Super. 380, 282 A.2d 432 (1971), where the husband's concealment of actual drug addiction, nonratified by the wife, was sufficient fraud to grant annulment.

■ Respondent testified that he had heterosexual relations with appellant for a ten year period, about five of which had to be before the marriage took place. Clearly the marriage was consummated and cohabitation took place up to the time the parties separated in September, 1984. Thus, the fact that appellant used drugs and engaged in lesbian activities had nothing to do with consummation of the marriage or with the essential part thereof of sexual intercourse. Respondent testified that he thought they were fine sexually. There is nothing which personally endangered respondent in appellant's lesbian activities or her drug usage, which was the fact in *Watson v. Watson*, supra. The marriage was here consummated satisfactorily which is contrary to the facts in *Kshaiboon*, supra, and in *Santos*, supra. Since the parties had engaged in normal sexual relations both prior to and subsequent to the marriage, there would

exist no basis for appellant to believe that her lesbian activities would go to the very basic essential of normal and usual sexual intercourse, there was not cast upon her an affirmative duty to disclose to respondent her relations with other women. She, of course, made no affirmative misrepresentation of that fact. In Kingsley, "Fraud as a Ground for Annulment of a Marriage", 18 So.Cal.Law Rev. 214, 234, Sec. 19 (1945), it is said, "Fraud, basically, consists of a *misrepresentation* of a fact. Ordinarily, such misrepresentation will be by affirmative statement of fact, contrary to the truth. However, there are some things about which the law requires a prospective spouse to volunteer information and a concealment of which will be treated as fraudulent. In this class are pregnancy, venereal disease (and presumably other diseases going to the 'essentials'), sterility, and similar matters." The allegation here of appellant's lesbian activities is akin to one of premarital unchastity or misrepresentation of chastity. In 3 Nelson Divorce and Annulment 2d, § 31.39, p. 322, it is said, "As a general rule, a marriage is not annulable by one of the parties in respect of his or her chastity prior to the marriage. In other words, concealments or misrepresentations of this character are held to fall short of constituting grounds for annulment, for the reason that chastity at a time prior to the marriage is not regarded as vital to the marriage relation." See these cases along that line: *Heath v. Heath*, 85 N.H. 419, 159 A. 418 (1932), which involved as a basis for annulment a prior conviction of the husband for adultery, held not to be so serious a fraud on the female as to justify annulment of the marriage; *Wetstine v. Wetstine*, 114 Conn. 7, 157 A. 418 (1931), where the wife had an illegitimate child before marriage, and the husband, who had prenuptial intimacy with her could not claim divorce for deceit as to her chastity; *DuPont v. DuPont*, 33 Del.Ch. 364, 93 A.2d 500 (1952), where the husband had premarital adulterous sex with the wife, who told him she had been intimate with at least two other men, thus admitting adultery. Held, the husband was not entitled to annulment; *Travis v. Travis*, 183 Pa.Super. 273, 130 A.2d 724 (1957), where the wife bore an illegitimate child two years before the marriage, but made no representation as to her chastity, and the husband, who made no ascertainment of previous incontinence, was not entitled to annulment. But see *Reynolds v. Reynolds*, 85 Mass. 605 (1862), where a younger husband married an older woman, who represented that she was chaste, when in fact she was pregnant by another man. There was no condonation and the annulment was granted. What may be gleaned from all these cases, including *Watson, Kshaiboon,* and *Santos,* supra, is that annulment of marriage is the exception and not the rule, and must be granted only upon extraordinary facts.

Appellant's lesbian activities are reprehensible conduct not in accordance with the normal mores of society. Respondent, on the other hand, has had extramarital misconduct. What ever equities these parties are entitled to with regard to division of marital property, maintenance and appellant's right to attorneys' fees may be more appropriately determined in the dissolution proceedings in which both parties have pleaded that the marriage is irretrievably broken. The harsh remedy of annulment of the marriage, which leaves appellant with nothing therefrom, is inappropriate under the facts of this case. Surely the appellant's contribution, even as a homemaker for about 4½ years, may be taken into account in dissolution of the marriage proceedings. If the judgment were affirmed, it would result in an imposition of a penalty and a forfeiture of any rights of appellant in marital property which appellant may have acquired during the marriage.

The judgment is reversed and the case is remanded with directions to reinstate respondent's original petition and appellant's counterclaim for dissolution of marriage, and for further proceedings thereon.

BERREY, J., concurs and files separate concurring opinion.

MANFORD, J., dissents in separate dissenting opinion filed.

BERREY, Judge, concurring.

The nexus of this case revolves primarily about a single "lesbian activity" which occurred prior to the marriage.

Apparently Dr. Woy and Linda lived together for about five years before they decided to be legally joined as husband and wife. Then, they cohabitated for another four or five years. The marriage soured and dissolution proceedings were commenced. During a deposition Dr. Woy learned that his wife had engaged in a lesbian affair about a year before they were married. Linda had another lesbian encounter about a year and one-half later with the same party and a man: a "menage a trois." That she often used illegal drugs is clear from a thorough reading of the transcript and cannot be disputed.

This writer supports the general proposition that Amici Curiae briefs may be of value. The research furnished by such briefs may offer additional points that the court might otherwise overlook. It is never well to stifle legitimate debate in a free society, even though we may totally disagree with the aim and principles of the organizations tendering such briefs. For this reason I concur with the majority in overruling respondent's motion to strike the briefs.

Both the majority and dissent cite *Kshaiboon v. Kshaiboon,* 652 S.W.2d 219 (Mo. App.1983), as a reason for their opinion. Edward Kshaiboon lacked the physical or mental capability to engage in a normal sexual relationship with plaintiff and his only sexual activity with her following the marriage was unnatural. Based on this it could be argued that the marriage was therefore not consummated. The evidence in *Kshaiboon* supported an inference that Edward Kshaiboon knew of this condition and concealed it from plaintiff. The court further stated, "The sexual relationship is an essential element of the marital relationship and defendant's concealment of his limitations and performances in that regard justified an annulment." *Id.,* at 220. In *Watson v. Watson,* 143 S.W.2d 349, 350 (Mo.App.1940), the court reaffirms hornbook law that "fraudulent misrepresenta-

tion or concealment by defendant of the fact that she was suffering from syphilis is shown by clear, satisfactory, and convincing evidence. Such a fraud pertains to an essential of the marriage relation and obviously entitles plaintiff to an annulment of the marriage." From the facts herein the instant case is not comparable with either *Watson* or *Kshaiboon.*

The writer shares many of the concerns expressed in the dissent. The issue in this case is, did the failure of Linda to disclose one act of lesbianism prior to marriage amount to and constitute a fraud of concealment such as to warrant annulment.

Linda admits to one lesbian experience with Shirley Charlton and denies she told Shirley Charlton of another lesbian affair. Linda testified after the marriage she had a lesbian affair with Shirley and Dr. Woy was present. According to Linda, Dr. Woy had always wanted to engage in a "Threesome." Subsequently, Linda and Dr. Woy continued to engage in "normal" sexual relations.

Linda was asked:

Q. Why did you not tell George about your lesbian affair before you married him?

A. There didn't seem to be any point. He didn't bare his soul to me. He didn't ever ask either.

Linda testified that after the threesome she told Dr. Woy of the lesbian incident before the marriage. Dr. Woy denies any knowledge of Linda's lesbian activities until her deposition was taken. There is no allegation that Linda required lesbian gratification to engage in normal sexual activities in the marriage bed.

A similar scenerio to the instant case appears in *Freitag v. Freitag,* 40 Misc.2d 163, 242 N.Y.S.2d 643 (1963), wherein the court denied plaintiff's request for annulment. In *Freitag,* the wife sought annulment of her marriage from her husband on the grounds that before the marriage he fraudulently withheld from her his homosexual proclivities. The parties were intimate before the marriage, had a "not unhappy" honeymoon and for three weeks

following their honeymoon cohabitated uneventfully. Then the husband became impotent and unable to fulfill his marital contract. Several weeks later he confessed to her his prior homosexual acts and she was "aghast." *Id.* The court in *Freitag* noted, "After reading the record of the trial and the briefs submitted by counsel for plaintiff, the court is unable to conclude that we have here a *true case* of homosexuality or that the condition of the defendant is incurable. Both before and after marriage the couple admittedly did have a mutual heterosexual orientation, apparently satisfactory to the plaintiff." (Emphasis added.) *Id.*, at 644, 242 N.Y.S.2d 643.

This writer notes:

The degree of fraud sufficient to vitiate an ordinary contract will not afford sufficient ground for the annulment of a marriage. It is not sufficient that the party relied upon the false representations and was deceived, or that important and essential facts were concealed with intent to deceive. The marriage relation is a status controlled and regulated by considerations of public policy which are paramount to the rights of the parties. * * It is contrary to public policy to annul a marriage for concealment by a woman of her unchastity prior to marriage. Antenuptial incontinence is not a ground for annulment or for divorce. Not even does the concealment of previous unchaste and *immoral behavior* vitiate a marriage; for, although this seems to strike into the essence of the contract yet public policy pronounces otherwise, and opens marriage as the gateway to repentence and virtue. (Citations omitted.)

(Emphasis added.) *Browning v. Browning*, 89 Kan. 98, 130 P. 852, 854 (1913).

As stated above, the fraud must go to the very essence of the marital contract to vitiate the marriage. The fraud must be something essential to the marriage relation, making its performance impossible or its continuance dangerous to health or life. *Bielby v. Bielby*, 333 Ill. 478, 165 N.E. 231, 233 (1929). The court in *Heath v. Heath*, 85 N.H. 419, 159 A. 418, 425 (1932), stated: "Whatever the differences in definition of

the kind and nature of fraud required to warrant an annulment, deception by one of the parties as to character, morality, habits, wealth, or social position is generally held insufficient."

This writer finds that in this case the lesbian activities of Linda did not rise to the level of interferring with the essentials of the marriage relation, of making it impossible to perform the duties and obligations of that relationship.

A corollary to the instant question of whether Linda's escapade is enough to strike the marriage invalid might be whether Dr. Woy is a wife beater and, as such, perpetrated a fraud on Linda warranting the marriage to be declared void. On one occasion he struck Linda and told his marriage counselor of the event and during the course of the trial stated, "That's the only time I can remember beating Linda."

For the reasons stated herein I concur in the opinion of PRITCHARD, J.

MANFORD, Judge, dissenting.

I must respectfully dissent.

No general quarrel is made regarding the factual account set forth in the majority opinion.

One matter needs to be clarified at the outset, however. The majority opinion discloses the overruling of a motion to strike the briefs amicus curiae submitted by the Women's Legal Defense Fund, N.O.W. Legal Defense, and Education Fund and the American Civil Liberties Union of Western Missouri. At the time of oral argument, the author of the majority opinion, then presiding, attempted to overrule the motion. This writer objected and the third member of the division joined in that objection. The motion was ordered taken with the case. The majority opinion now declares the motion overruled. This writer does not support such ruling. It can only be presumed that the third member of the division now recommends and supports such ruling because he has embraced and approved the majority opinion.

To be sure, there is a sparsity of cases in our state directing the setting aside of mar-

ital contracts under the rule of annulment. Two cases appear to have dealt with the question. They are *Watson v. Watson,* 143 S.W.2d 349 (Mo.App.1940) and *Kshaiboon v. Kshaiboon,* 652 S.W.2d 219 (Mo.App. 1983).

The majority opinion predicates its result upon the incorrect presumption that appellant had no affirmative duty to disclose her lesbian behavior to respondent "and whether those known activities prior to the marriage went to an essential element of the marital relationship".

The second portion of the majority premise is simple to address by mere reference to the evidence upon the record. The record reveals that respondent first learned of appellant's lesbian behavior during pretrial discovery. Not only did respondent immediately repudiate appellant's conduct, but (as the evidence clearly indicates) respondent would not likely have married appellant had the fact of her lesbian behavior been known to him prior to the marriage. The evidence is also quite clear that appellant knew and admitted that the marriage would not have occurred had her lesbian behavior been made known to respondent. Although appellant declared that she was not a lesbian, she freely admitted to two encounters with another female, once prior to the marriage and once subsequent to the marriage. There was evidence where she had been swimming with respondent's daughter in the nude and that the two, on repeated occasions, exited the pool and engaged in touching. Additionally, there is evidence wherein appellant was in a hot tub with respondent's daughter and her friends, and appellant removed the bathing suit of one of the daughter's female friends.

There is no doubt that the evidence was sufficient to support a finding by the trial court as the trier of fact that appellant is a lesbian. It cannot be concluded, as is done in the majority opinion, that such behavior did not go to "an essential element of the marital relationship", and the majority opinion, based upon the facts and circumstances upon this record, has simply reached the incorrect conclusion.

As to the first portion of the majority's question above, it is interesting to note that neither *Watson* nor *Kshaiboon* discloses, and certainly does not require, a showing of any "affirmative duty" to reveal. This is an element created by the majority opinion herein simply to achieve the result reached. Indeed, the cases researched by this writer do not disclose any such "duty". It is clear to see how the majority opinion gets itself into such a position, because the limited number of cases on annulment have disposed of the question on the basis of fraud. The majority then refers to fraud and deceit as a subject within Am.Jur.2d, and the majority becomes satisfied by adopting the requirement of a "legal duty" as that term is utilized in the discussion on fraud and deceit.

As discussed *infra,* it is suggested by this writer that the unique relationship intended by a marital contract requires that the law should deal with it in a particular manner and not resolve any disputes relative thereto under principles applicable to nonmarital contracts. Indeed, there is a whole body of law in this nation which has done just that (i.e., dissolution actions, custody, marital property, child support, and maintenance) and yet the majority herein has chosen to apply definitions and principles more applicable to nonmarital contracts than marital contracts. Before discussion of this point, however, let us examine the "duty" rule and see if it applies herein, and if it is within prior rules laid down by our courts.

The majority opinion does not take exception to the rulings in *Watson* and *Kshaiboon.* Let it be assumed that both of these cases hold that an annulment was ordered upon the basis of fraud. Let it be further assumed that there was a breach of duty in both cases. The "duty breached" in *Watson* was the wife's knowledge of the existence of pre-marital syphilis and her concealment of that fact. In *Kshaiboon,* the "duty breached" was the husband's knowledge of his lack of the mental and physical capacity to engage in a normal sexual relationship with his wife and the concealment of that fact. It can then be concluded that

both cases are likened to the present case in that one spouse was possessed with pre-marital knowledge and concealed that from the other spouse prior to the marriage. The evidence herein supports the finding that appellant knew of her lesbian behavior prior to marriage, did not disclose it to respondent, and indeed admitted that respondent would probably not have married her if her lesbian behavior had been disclosed to respondent.

When *Watson* and *Kshaiboon* are compared with the present case, it is obvious what the majority opinion has concluded. The majority opinion has ruled that an undisclosed venereal disease (*in Watson*) is a basis for annulment. The majority opinion has ruled that abnormal sexual behavior (*Kshaiboon*) is a basis for annulment. However, when faced with homosexual behavior, (lesbianism herein), the majority opinion dismisses such behavior as mere unchastity prior to the marriage. This conclusion is particularly puzzling in light of the majority opinion's declaration that appellant's lesbian behavior is "reprehensible conduct not in accordance with the normal mores of society". By the reasoning set forth in the majority opinion, it must follow that pre-marital pregnancy, venereal disease, abnormal sexual behavior, and sterility are beyond unchastity, and serve as a basis for annulment; but that homosexual behavior is not, and pre-marital homosexuality is, akin to unchastity. The unsoundness of such reasoning is obvious. Further, such unsound reasoning does not equate with the majority opinion's declaration that appellant's lesbian behavior is reprehensible and not in accord with normal mores of society.

On a purely legal basis, the result reached by the majority flies in the face of both *Watson* and *Kshaiboon*. The conflict is obvious. Thus, it must be asked: Does the evidence herein cause a distinction to be drawn? The factual account set forth by the majority clearly dispels any doubt that this case should not be distinguished from either *Watson* or *Kshaiboon, supra.*

In reality, what appellant seeks, and obviously what the majority opinion supports, is the condonation of her lesbian behavior to the extent of pursuing her assertions within an action for dissolution. This must be so, because the majority concludes that appellant's lesbian behavior was merely pre-marital unchastity.

While it is obvious that our society has changed and continues to change with the process of time, this writer cannot believe that our society is at a point of being willing to embrace homosexuality as a lifestyle worthy of social recognition and support. Further, this writer cannot believe that our society is willing, or even desirous, of our court's pronouncing that homosexuality is merely akin to unchastity. To be sure, such behavior is unchaste, but it is far more than that and certainly is in no manner conducive to a wholesome marital relationship. In fact, such reprehensible behavior is a direct affront to a wholesome marital relationship, not to mention that such behavior is also reprehensible in all other social relationships additional to the marital relationship.

If appellant's pre-marital and post-marital lesbian behavior is not relative to any essential element of the marital relationship, then can it be said that any conduct in any form ever will be? What of beastiality or any other conduct which might spring forth from the human mind? In other words, would beastiality be mere unchastity? If we follow the reasoning employed in the majority opinion, the answer would have to be yes.

*Watson* and *Kshaiboon* are directly applicable to the present case and should apply, even under the majority's view of a required or applicable duty. Appellant had the "duty" to disclose her lesbian behavior, for such behavior is no different than the venereal disease element in *Watson,* and certainly was abnormal within the sense of that term under *Kshaiboon.*

The majority cannot avoid rules in *Watson* and *Kshaiboon* simply upon reference to the disclosure of appellant's lesbian behavior during a dissolution proceeding, and after the fact that the parties had engaged in a sexual relationship spanning almost ten years. Such simplified reasoning ig-

nores the fact that the lesbian behavior of appellant only became known to respondent after the marriage. The disclosure of the lesbian behavior must be considered in light of and with specific reference to whether respondent would have entered into the marital relationship had appellant's lesbian behavior been disclosed prior to the marriage. The evidence is clear that respondent would not have, and indeed appellant concedes that respondent would probably not have, entered into the marital relationship if disclosure had been made. That is the prospective within which this case must be placed, and it is obvious that appellant's lesbian behavior and respondent's rejection of such behavior goes directly to the marital relationship and is an essential element of that relationship.

This writer feels that the majority opinion, along with other courts, has failed to take the proper approach to the disposition of questions presented by such a case as the present case. At the very outset, our courts have either elected or have forgotten that the marriage contract is of a special nature; and more frequently than not, our courts choose to dispose of disputes arising from marital contracts along principles applicable to other forms of contract. The marital contract has been aptly defined as follows: .

> Marriage is a contract under which a *man* and a *woman* reciprocally engage to live with each other during their joint lives and to discharge toward each other the duties imposed by law on the relation of husband and wife." 55 C.J.S. Marriage § 1 (emphasis added)

The nature of the marriage contract has been defined thusly:

> Marriage is generally considered a civil contract *differing in notable respects from ordinary contracts, but it is also and specially a status or personal relation in which the state is deeply concerned and over which the state exercises exclusive dominion.* 55 C.J.S. Marriage § 1(b) at 806

In the opinion of this writer, the courts, over the years, have made two glaring errors in the attempt to resolve the numerous disputes which have arisen from marital contracts. First, our courts have made the sexual relationship of the parties almost an exclusive criteria in too many cases. This is evident within the majority opinion which suggests that appellant's lesbian behavior had nothing to do "with the essential part thereof [the marriage], sexual intercourse." It is submitted that the majority opinion, in line with many other cases, has concluded that sexual intercourse is the one exclusive basis of the marital relationship. Indeed, sexual relations within the marital relationship are a vital and important part of that relationship, whether viewed as merely a pleasurable conduct or from the necessity of procreation. However, it is submitted that there are also other elements vital to the marriage relationship. Such a relationship provides the benchmark of an orderly society. Such a relationship provides the basis for a homestyle conducive of a wholesome environment for all the members of that relationship and to society collectively. It provides the basis for social stability so a society can collectively achieve an ever-expanding wholesome lifestyle. It provides a basis whereby the progeny thereof may feel secure and thus contribute even more to the overall good of society than their ancestors.

To be sure, the above is the ideal, and regrettably too often the goals intended by the marital relationship are not achieved. But it is submitted that such failures do not warrant or even allow for the adoption of any legal rule or principle which runs contrary to or fails to support such an ideal.

Hence, it has been, and if the majority opinion becomes the law of our state, it will continue to be a mistake to have resolved such questions as are presented by appellant's lesbian behavior herein, simply upon a conclusion that such behavior has not impacted upon the sexual relationship between the parties. Stated another way, if the sexual relationship between the parties is to be the criteria, then any form of conduct by either party, no matter how repugnant or repulsive, is to be disregard-

ed so long as the sexual relationship between the parties exists. Such reasoning is not only an expression of ignorance, but it chooses to discount all other vital elements of the marital relationship. Thus, under such reasoning, the parties might have enjoyed a harmonious sexual relationship, but opposition or rejection of one as regards the other's behavior could be present which is disruptive of the marital relationship, or at the outset might have prevented the establishment of the marital relationship, and yet such opposition or rejection could never serve as a basis for declaring the marital contract void or voidable.

Further, it has been error for our courts, as indeed the majority opinion herein has erred, to resolve marital disputes challenging the validity of the marital contract upon the rules and principles of fraud. Thus, our courts have engaged, and continue to engage, in an approach to such matters which allows them to avoid determination of the basic question, which is: Shall any and all forms or types of human behavior be acceptable in our society, and is it to be recognized and protected by our legal system? or, Are there recognizable limits to human behavior beyond which society will neither accept nor protect?

If the above question is applied to the present proceedings, it would read thusly: Is homosexual behavior an acceptable behavior in our society, and should it be recognized and protected by our legal system? or, Is homosexual behavior (to use the words of the majority opinion) "reprehensible conduct not in accordance with the normal more of society" beyond which society will neither accept nor protect? That is the question which the case herein presents, and the one which this court should answer in lieu of engaging in the fiction of fraud and deceit which has been the approach by courts previously, and in turn adopted by the majority herein.

The answer to the question by this writer is that, quite simply, homosexual behavior is such behavior beyond the recognized and acceptable limits and to which society owes no acceptance or protection. Thus, it follows that homosexual behavior should find no acceptance or protection and when discovered or disclosed relative to the marital relationship, such behavior can and should be a definite basis for voiding the marital relationship or contract, or serve as a basis for avoidance of the marital relationship or contract.

It appears that the courts have long been reluctant to face up to such questions, and it might even be said of today's courts that they are intimidated to the point they will not face such questions. This intimidation rests in part from the noisy clamor from a distinct and definitely small minority claiming that a decision against the recognition, acceptance and protection of homosexuality in various ways, denies those desirous of engaging in homosexuality the right to do so. Such a decision does nothing of the kind. It merely states that society refuses to recognize such "reprehensible conduct" and the law will afford no protection or enforcement of any rights where such "reprehensible conduct" is in any manner involved.

The state, that is society, has the right to take such a position, particularly where the marital contract or relationship is involved, and it is irresponsible for any court to avoid facing the obvious question, and to, in turn, engage in some legal fiction to derive such a conclusion.

This dissent has not even bothered to address the drug addiction question in detail, because this writer deems affirmance is sufficient upon the issue of appellant's lesbian behavior. However, this dissent cannot agree that appellant's drug addiction, to which there was ample evidence, would not suffice as a basis for annulment. Furthermore, the effect of appellant's drug addiction regarding respondent's license to practice, or that it might affect respondent's reputation, is not in issue herein. Appellant's drug addiction, as regards grounds for annulment, is relative as to how it affected the marital relationship. The record is quite clear that respondent was adamantly opposed to the use of illegal drugs by anyone, including appellant. Thus, appellant's drug use was another basis for the granting of annulment.

The judgment of the circuit court should be affirmed upon the basis that appellant's lesbian behavior and her addiction to illegal drugs were disruptive of and even destructive of essential elements of the marital relationship, warranting an annulment of the marital relationship or contract.